# Illinois Official Reports

## Supreme Court

---

### *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870

---

| | |
|---|---|
| Caption in Supreme Court: | J&J VENTURES GAMING, LLC, *et al.*, Appellants, v. WILD, INC. (Accel Entertainment Gaming, LLC, *et al.*, Appellees). |
| Docket Nos. | 119870, 119871, 119872, 119873, 119874 cons. |
| Filed | September 22, 2016 |
| Rehearing denied | November 21, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of Madison County, the Hon. Donald M. Flack, Judge, presiding. |
| Judgment | Appellate court judgments affirmed. |
| Counsel on Appeal | Christopher A. Koester and Aaron Jones, of Taylor Law Offices, PC, of Effingham, and J. Timothy Eaton and Jonathan B. Amarilio, of Taft Stettinius & Hollister LLP, of Chicago, for appellant J&J Ventures Gaming, LLC.

William M. Gantz and Gail S. Eisenberg, of Dentons US LLP, of Chicago, for appellant Action Gaming, LLC.

Steven P. Blonder and Marissa L. Downs, of Much Shelist, P.C., of Chicago, and G. Patrick Murphy and Patricia S. Murphy, of Murphy & Murphy LLC, of Marion, for appellee Accel Entertainment Gaming LLC. |

Lisa Madigan, Attorney General, of Springfield (Carolyn E. Shapiro, Solicitor General, and Frank H. Bieszczat, Assistant Attorney General, of Chicago, of counsel), for intervenor-appellee Illinois Gaming Board.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion.

Justice Karmeier took no part in the decision.

## OPINION

¶ 1    At issue in these consolidated appeals is whether the circuit courts have subject-matter jurisdiction to determine whether the location agreements between plaintiffs and defendants are valid and enforceable contracts that control the placement of video gaming terminals in defendants' establishments. The appellate court held that the circuit courts lack subject-matter jurisdiction because the Illinois Gaming Board has exclusive authority over contracts for the placement of video gaming terminals. The appeals are before us pursuant to certificates of importance granted under article VI, section 4(c), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VI, § 4(c)) and Illinois Supreme Court Rule 316 (eff. Dec. 6, 2006). We consolidated the appeals[1] and granted the Illinois Gaming Board leave to intervene. For the reasons that follow, we affirm the judgments of the appellate court.

¶ 2                                    BACKGROUND

¶ 3    In July 2009, the General Assembly enacted the Video Gaming Act (Act) (230 ILCS 40/1 *et seq.* (West 2014)), which legalized the use of video gaming terminals as a new form of commercial gambling within certain licensed establishments, including bars, veterans organizations, fraternal organizations, and truck stops. As provided in the Act, the Illinois Gaming Board (Gaming Board or Board)[2] has jurisdiction over and shall supervise all video gaming operations governed by the Act. 230 ILCS 40/78 (West 2014). The Board also has all

---

[1]These consolidated appeals arise from 10 lawsuits filed in three counties. All of the actions were brought by J&J Ventures Gaming, LLC, and Action Gaming, LLC, and were based on contracts that contain substantially identical provisions for the placement of video gaming terminals in the 10 defendant establishments.

[2]The Illinois Gaming Board was initially established in 1990 to administer the Riverboat Gambling Act (230 ILCS 10/5 *et seq.* (West 2014)). The provisions of the Riverboat Gambling Act and all of the rules promulgated thereunder apply to the Video Gaming Act, except where there is a conflict between the two statutes. 230 ILCS 40/80 (West 2014).

powers necessary and proper to effectively execute the provisions of the Act. *Id.* Those powers include the authority to adopt regulations for the purpose of administering the Act and "to provide for the prevention of practices detrimental to the public interest and for the best interests of video gaming." *Id.* In October 2009, the Board adopted emergency regulations to administer the Act. 11 Ill. Adm. Code 1800, emergency rules adopted at 33 Ill. Reg. 14793 (eff. Oct. 19, 2009); permanent rules adopted at 34 Ill. Reg. 2893 (eff. Feb. 22, 2010). After a start-up period of approximately three years, video gaming operations commenced in October 2012.

¶ 4	A video gaming terminal is an electronic device that allows users to play a video game, such as video poker or blackjack, and permits the user to receive free games or credits that can be redeemed for cash. 230 ILCS 40/5 (West 2014). The Act restricts the use of video gaming terminals by requiring that they be operated only at licensed establishments and by licensed terminal operators. 230 ILCS 40/25 (West 2014). Licenses are granted by the Board, following a background investigation of the applicant and subject to requirements that are designed "to preserve the integrity and security of video gaming." 230 ILCS 40/45 (West 2014); 11 Ill. Adm. Code 1800.420, amended at 37 Ill. Reg. 7750 (eff. May 23, 2013). A video gaming terminal may be placed in a licensed establishment only if the establishment has entered into a written use agreement with the licensed terminal operator for the placement of that device. 230 ILCS 40/25(e) (West 2014). A "use agreement" is a contract between a licensed terminal operator and a licensed establishment prescribing the terms and conditions for placement and operation of terminals at that establishment. *Id.*; 11 Ill. Adm. Code 1800.320(a) (2010).[3] A use agreement may be assigned only from one licensed terminal operator to another. 11 Ill. Adm. Code 1800.320(d) (2010).

¶ 5	Shortly after the Act became effective and prior to the Board's adoption of emergency regulations, Action Amusement Company, LLC (Action Amusement), an unlicensed terminal operator, executed agreements entitled "Exclusive Location and Video Gaming Terminal Agreements" with each of the defendant establishments involved in these consolidated appeals. Those agreements, which are substantially identical, purported to give Action Amusement the exclusive right to place and operate video gaming terminals within the defendant establishments. Each agreement included a "Recitals" portion, stating that Action Amusement and the establishment would obtain a license from the Board and wished to enter into an exclusive location agreement "for the purpose of placing and operating video gaming terminals in the Licensed Establishment." Each agreement also stated that, "[i]n accordance with the Video Gaming Act," the parties agreed to evenly split the after-tax profits from the operation of the terminals. The term of each agreement was for a period of five years, beginning on the date the first video gaming terminal was operated in the licensed establishment.

¶ 6	In addition, each agreement provided that, during the term of the agreement, the terminal operator would have the exclusive right to place video gaming terminals in the licensed establishment and further provided that the agreement would be binding upon the successors

_____

[3]The Board's regulation establishing the minimum standards for use agreements was amended after the location agreements at issue were executed. The amended regulation requires that, after July 15, 2014, a licensed terminal operator must be licensed by the Board at the time the use agreement is signed. 11 Ill. Adm. Code 1800.320(a), amended at 38 Ill. Reg. 14275 (eff. June 30, 2014).

and/or assigns of the parties. Also, each agreement expressly acknowledged that nothing of value had been offered or received in exchange for the execution of the agreement and that it is a violation of the Act to offer anything as an inducement for the procurement of a location.

¶ 7 On October 5, 2010, Action Amusement assigned its rights under the location agreements to Action Gaming, LLC (Action Gaming), another unlicensed terminal operator. In exchange for the assignment of rights under the location agreements, Action Gaming agreed to pay Action Amusement $10,000 per month until August 1, 2011. After that date, once Action Gaming was operating video gaming terminals in at least 70 locations, it agreed to pay Action Amusement up to $20,000 per month for the next 10 years, depending on the number of locations at which it was operating terminals. The assignment was signed by Jason Rowell, as authorized representative of both Action Amusement and Action Gaming.

¶ 8 Between January and May 2012, Action Gaming and the defendant establishments amended their location agreements by adding certain clauses, which were asserted to be "necessary in order for the Agreement to comply with the [Act] and the rules and regulations promulgated thereunder." The additional terms included a clause providing that Action Gaming could freely assign its rights until it obtained a terminal operator license, after which it could assign its right only to another licensed terminal operator. Another clause, titled "IGB Approval," provided that the parties acknowledged that their location agreement and the amendment "are subject to and contingent upon the [Gaming Board's] review of, and to the extent required by the [Board], consent to the use of this [a]mendment." When the amendments were executed, Action Gaming and the defendant establishments were not licensed by the Board to participate in video gaming.

¶ 9 On July 19, 2012, the Board notified Action Gaming that its license application had been denied based on its findings that Nicky Nichols and Jason Rowell, employees and owners of Action Gaming, were personally and professionally associated with James Koehler, who had been convicted of illegal gambling. The Board also cited its finding that Nichols had engaged in business practices and maintained associations with a number of convicted felons. Under the Board's regulations, Action Gaming was an "applicant" at the time this letter was issued. 11 Ill. Adm. Code 1800.695 (2010). Action Gaming requested a hearing to contest the denial of its license application. The Board denied the request for a hearing on September 20, 2012.

¶ 10 On August 24, 2012, while Action Gaming's request for a hearing on the denial of its application was pending, it assigned its rights under the subject location agreements to J&J Ventures Gaming, LLC (J&J Ventures), a licensed terminal operator, in exchange for a purchase price. That assignment specifically stated that, in consideration for the purchase price, Action Gaming agreed to assign and J&J Ventures agreed to accept all rights "under each Use Agreement." This assignment was executed by Nicky Nichols on behalf of Action Gaming, as its member/manager. At the time of the assignment, J&J Ventures was a licensed terminal operator, but the 10 defendant establishments were not yet licensed by the Board.

¶ 11 During late August and early September 2012, each of the defendant establishments signed separate location agreements with Accel Entertainment Gaming, LLC (Accel), a licensed terminal operator. Those agreements purported to grant Accel the exclusive right to operate video gaming terminals within the defendant establishments.

¶ 12 Thereafter, plaintiffs J&J Ventures and Action Gaming subsequently brought the 10 underlying lawsuits in the circuit courts seeking declaratory judgments against the defendant

establishments. The complaints asserted that the circuit courts had jurisdiction over the disputes under the Illinois declaratory judgment statute (735 ILCS 5/2-701 (West 2012)). In addition, the complaints alleged that J&J Ventures had the exclusive right to operate video gaming terminals at the defendant establishments under the location agreements obtained by assignment from Action Gaming. The complaints also alleged that the assignments were valid because the exclusive location agreements were "precursor" agreements that were "not yet" use agreements. Based on this assertion, the complaints claimed that the Gaming Board's regulation precluding the assignment of a use agreement except from one licensed terminal operator to another (11 Ill. Adm. Code 1800.320(d) (2010)) did not apply. The complaints further alleged that, because the location agreements Action Gaming had assigned to J&J Ventures would not become use agreements until the parties were licensed by the Board, those agreements were freely assignable. As relief, J&J Ventures and Action Gaming requested declarations that (1) the agreements between J&J Ventures and the defendant establishments were binding, (2) the assignments from Action Amusement to Action Gaming and from Action Gaming to J&J Ventures were valid, (3) J&J Ventures held the exclusive right to operate video gaming terminals at the defendant establishments, and (4) the defendant establishments could not allow other terminal operators to install or operate video gaming terminals without breaching those agreements.

¶ 13    Accel was granted leave to intervene in all 10 declaratory judgment actions, over the objections of J&J Ventures and Action Gaming. In answer to the complaints, Accel alleged that the location agreements that had been assigned to Action Gaming and later to J&J Ventures were invalid because they did not comply with the Act and the Board's regulations.[4]

¶ 14    While the declaratory judgment actions were pending, the appellate court for the Third District issued its opinion in *Triple 7 Illinois, LLC v. Gaming & Entertainment Management-Illinois, LLC*, 2013 IL App (3d) 120860, which involved successive assignments of a location agreement by an unlicensed terminal operator under factual circumstances that were virtually identical to those on which the present appeals are based. *Id.* ¶¶ 2-5. In that case, the Third District addressed the question of whether the Board's regulation precluding the assignment of a use agreement except from one licensed terminal operator to another (11 Ill. Adm. Code. 1800.320(d) (2010)) rendered the assignment of the exclusive location agreement by an unlicensed terminal operator invalid. *Triple 7*, 2013 IL App (3d) 120860, ¶ 15. The Third District held that because the location agreement was between an unlicensed establishment and an unlicensed terminal operator, it was not a use agreement, and the Board's regulation restricting the assignment of use agreements did not apply. *Id.* ¶ 17. The court further held that neither the Act nor the Board's regulations specifically prohibited agreements between unlicensed entities. *Id.* ¶ 21. Accordingly, the court affirmed the circuit court's dismissal of the complaint, which sought a declaration that the exclusive location agreement between unlicensed entities was invalid. *Id.* ¶¶ 8, 33. The

---

[4]In four of the actions—involving Wild, Inc., Lonnie's Liquor, Denny's Package Liquor, and Chiefs—Accel also filed counterclaims against J&J Ventures and Action Gaming, asserting that it had the exclusive right to place video gaming terminals in those establishments. Those counterclaims were based on use agreements that were executed after Accel and each of the defendant establishments had been licensed.

Third District did not address the issue of the circuit court's subject-matter jurisdiction over the claims.

¶ 15    Based on the holding in *Triple 7*, the circuit courts considering the 10 declaratory judgment actions underlying these appeals ruled that the location agreements between J&J Ventures and the defendant establishments were not use agreements and were valid, binding, and enforceable contracts. Accordingly, the circuit courts enjoined Accel from operating video gaming terminals at the defendant establishments.

¶ 16    Accel sought review of those judgments in the Appellate Court, Fifth District, which consolidated the five appeals for the purpose of oral argument. During that argument, the appellate court *sua sponte* raised the issue of the circuit courts' subject-matter jurisdiction and ordered supplemental briefing on the question of whether the Gaming Board had exclusive jurisdiction over the disputes. In their supplemental briefs, all of the parties argued that the circuit courts have subject-matter jurisdiction to determine the validity of the location agreements assigned to J&J Ventures by Action Gaming.

¶ 17    The appellate court vacated the circuit courts' judgments and dismissed the appeals, holding that the circuit courts lacked subject-matter jurisdiction over the disputes because the Board had exclusive jurisdiction over the matter that formed the basis of the parties' claims. 2015 IL App (5th) 140092; see also *J&J Ventures Gaming, LLC v. Whitlock Chiefs, Inc.*, No. 5-14-0181 (2015) (unpublished summary order) (d/b/a Chiefs); *J&J Ventures Gaming, LLC v. Coatney*, No. 5-14-0180 (2015) (unpublished summary order) (d/b/a Denny's Package Liquor); *J&J Ventures Gaming, LLC v. Mule Barn, Inc.*, No. 5-14-0171 (2015) (unpublished summary order); *J&J Ventures Gaming, LLC v. Ole Lonnie's Liquor, Inc.*, No. 5-14-0093 (2015) (unpublished summary order) (d/b/a Lonnie's Liquor).[5] Those judgments were based on the court's determination that the Gaming Board has exclusive authority over all agreements that purport to control the placement and operation of video gaming terminals within a licensed establishment. 2015 IL App (5th) 140092, ¶¶ 32, 62. As a consequence, the appellate court refused to follow the reasoning employed in *Triple 7* and declined to consider the merits of the parties' disputes. *Id.* ¶¶ 55, 60.

¶ 18    On the application of J&J Ventures and Action Gaming, the appellate court granted certificates of importance in all five appeals. Ill. S. Ct. R. 316 (eff. Dec. 6, 2006). Thereafter, this court granted the parties' joint motion to consolidate the appeals and also allowed the Board's motion for leave to intervene and to be aligned as an appellee.

¶ 19                                    ANALYSIS

¶ 20    The underlying declaratory judgment actions are predicated on a dispute over the validity and enforceability of the location agreements assigned to J&J Ventures. The issue before this court, however, is which tribunal has jurisdiction to determine whether the location agreements are valid and enforceable.

---

[5]The appellate court issued a published opinion explaining its reasoning in the appeal involving Wild, Inc., and cited to that opinion in resolving the remaining four appeals, which were decided in unpublished summary orders under Illinois Supreme Court Rule 23(c)(1) and (2) (eff. July 1, 2011). Accordingly, in discussing the appellate court's analysis, we cite to the opinion in *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2015 IL App (5th) 140092.

- 6 -

¶ 21 J&J Ventures and Action Gaming argue that the appellate court erred in holding that the circuit courts lack subject-matter jurisdiction to determine the validity of the location agreements. J&J Ventures and Action Gaming further assert that the judgments of the appellate court operate to deprive them of their right to freely contract protected by the contract clauses of the United States and Illinois Constitutions (U.S. Const., art. I, § 10; Ill. Const. 1970, art. I, § 16) and of their right to a jury trial (U.S. Const., amend. VII; Ill. Const. 1970, art. I, § 13). J&J Ventures and Action Gaming also ask this court to decide these appeals on the merits and affirm the circuit courts' findings that the agreements are valid and enforceable under the reasoning expressed by the Third District in *Triple 7*.

¶ 22 Accel agrees that the appellate court erred with respect to the jurisdictional issue but contends that the appellate court properly declined to follow the ruling in *Triple 7* because the location agreements assigned to J&J Ventures are not valid and binding. The Gaming Board argues that the appellate court correctly held that the circuit courts lack subject-matter jurisdiction to adjudicate the validity and enforceability of the location agreements.

¶ 23 Subject-matter jurisdiction refers to a tribunal's power to hear and determine cases of the general class to which the proceeding in question belongs. *Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.*, 2011 IL 111611, ¶ 27. In general, the Illinois Constitution vests the circuit courts with original jurisdiction over all justiciable matters, except in certain circumstances where this court has exclusive and original jurisdiction. Ill. Const.1970, art. VI, § 9. However, the legislature may explicitly vest original jurisdiction in an administrative agency when it enacts a comprehensive statutory scheme that creates rights and duties that have no counterpart in common law or equity. *Board of Education of Warren Township High School District 121 v. Warren Township High School Federation of Teachers, Local 504*, 128 Ill. 2d 155, 165 (1989); see also *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2015 IL 117443, ¶ 15.[6]

¶ 24 We note that in support of their argument that the circuit courts have subject-matter jurisdiction, J&J Ventures and Action Gaming rely on *Employers Mutual Cos. v. Skilling*, which stated that "if the legislative enactment does divest the circuit courts of their original jurisdiction through a comprehensive statutory administrative scheme, it must do so explicitly." *Employers Mutual Cos. v. Skilling*, 163 Ill. 2d 284, 287 (1994). As authority, the *Skilling* court cited *People v. NL Industries*, 152 Ill. 2d 82, 96-97 (1992), for the proposition that the absence of language explicitly excluding the circuit courts from exercising jurisdiction means that the legislature did not intend to divest circuit courts of jurisdiction. *Skilling*, 163 Ill. 2d at 287. Yet, *Skilling*'s description of the analysis in *NL Industries* is truncated and does not represent the full measure of this court's jurisprudence in ascertaining legislative intent to vest exclusive jurisdiction in an administrative agency. In fact, *NL Industries* considered the relevant statute as a whole, and the court referenced not only the lack of exclusionary language but also other statutory provisions that specifically referred to the circuit courts' ability to adjudicate the questions at issue. See *NL Industries*, 152 Ill. 2d at 97-99. Therefore, *NL Industries* implicitly recognized that legislative intent to divest circuit

[6]Although the term "jurisdiction" is not strictly applicable to an administrative agency, it may be used to refer to the authority of the administrative agency to act. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 243 (1989) (citing *Newkirk v. Bigard*, 109 Ill. 2d 28, 36 (1985)).

courts of jurisdiction may be discerned by considering the statute as a whole. Several of our other cases have employed similar analysis (see *Ferris, Thompson & Zweig, Ltd.*, 2015 IL 117443, ¶¶ 17, 19, 24; *Crossroads Ford Truck Sales, Inc.*, 2011 IL 111611, ¶¶ 37, 45, 54), and we do so here.

¶ 25    We look to the statutory framework of the Act to determine whether the legislature intended to vest the Gaming Board with exclusive jurisdiction to determine the validity of agreements that affect the placement and operation of video gaming terminals. See *Crossroads Ford Truck Sales, Inc.*, 2011 IL 111611, ¶ 28. This determination is a matter of statutory interpretation. *Ferris, Thompson & Zweig, Ltd.*, 2015 IL 117443, ¶ 17. When interpreting a statute, the court's primary objective is to ascertain and give effect to the intent of the legislature. *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 15; *Williams v. Staples*, 208 Ill. 2d 480, 487 (2004). The most reliable indicator of legislative intent is the language of the statute itself, which must be given its plain and ordinary meaning. *Chicago Teachers Union, Local No. 1*, 2012 IL 112566, ¶ 15; *Williams*, 208 Ill. 2d at 487. All provisions of a statute must be viewed as a whole, with the relevant statutory provisions construed together and not in isolation. *Chicago Teachers Union, Local No. 1*, 2012 IL 112566, ¶ 15; *Williams*, 208 Ill. 2d at 487. In addition, the court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute in one way or another. *Chicago Teachers Union, Local No. 1*, 2012 IL 112566, ¶ 15; *Williams*, 208 Ill. 2d at 487. Questions relating to the circuit court's jurisdiction and the interpretation of a statute both present issues of law, which we review *de novo*. *Chicago Teachers Union, Local No. 1*, 2012 IL 112566, ¶ 15; *Crossroads Ford Truck Sales, Inc.*, 2011 IL 111611, ¶¶ 26-27.

¶ 26    There is no common-law right in Illinois to engage in or profit from gambling. *Schneider v. Turner*, 130 Ill. 28, 39 (1889) (recognizing that "[n]othing is more clearly and firmly established by the common law, than that all gambling contracts are void"); *Mallett v. Butcher*, 41 Ill. 382, 384 (1866) (holding that all contracts having their origin in gaming are void, not voidable); see also *Tomm's Redemption, Inc. v. Park*, 333 Ill. App. 3d 1003, 1009 (2002); *Hall v. Montaleone*, 38 Ill. App. 3d 591, 592 (1976); *Brelsford v. Stoll*, 304 Ill. App. 222, 226 (1940). The Act, which legalized the use of video gaming terminals under certain limited circumstances, is an exception to the general prohibition against gambling. 230 ILCS 40/1 *et seq.* (West 2014). Consequently, gambling on video gaming terminals is permitted in Illinois only as authorized by the Act, and gaming contracts that do not conform to the applicable regulatory requirements are void.

¶ 27    The Act explicitly vests the Gaming Board with authority to administer the Act by granting the Board "all powers necessary and proper to fully and effectively execute [its] provisions" and by directing that the Board "shall have jurisdiction over and shall supervise all gaming operations governed by [the] Act." 230 ILCS 40/78(a) (West 2014). The Act expressly obligates the Board to investigate and determine the eligibility of applicants for licenses and to select from among competing applicants those applicants who best serve the interests of the citizens of Illinois. 230 ILCS 40/78(a)(1) (West 2014).

¶ 28    Further, the Act authorizes the Board to adopt regulations under which all video gaming is to be conducted, and those regulations "are to provide for the prevention of practices detrimental to the public interest and for the best interests of video gaming." 230 ILCS

- 8 -

40/78(a)(3) (West 2014). Pursuant to its authority under the Act, the Board has adopted regulations establishing certain qualifications and requirements of licensees in order to "preserve the integrity and security of video gaming" in Illinois. 230 ILCS 40/45(e) (West 2014); 11 Ill. Adm. Code 1800.420, amended at 37 Ill. Reg. 7750 (eff. May 23, 2013). The Board also has adopted regulations governing the license-application process and the procedure for requesting a hearing upon denial of a license application. 11 Ill. Adm. Code Subparts E, F.

¶ 29    In addition, the Board has adopted regulations that define the term "[u]se agreement" (11 Ill. Adm. Code 1800.110, amended at 40 Ill. Reg. 8760 (eff. June 14, 2016)) and establish the minimum standards that use agreements must satisfy (11 Ill. Adm. Code 1800.320 (2010)). The term "[u]se agreement" is defined as "[a] contractual agreement between a licensed terminal operator and a licensed video gaming location establishing terms and conditions for placement and operation of video gaming terminals by the licensed terminal operator within the premises of the licensed video gaming location." 11 Ill. Adm. Code 1800.110, amended at 40 Ill. Reg. 8760 (eff. June 14, 2016). The minimum standards for use agreements require that such contracts only be between "a licensed terminal operator and a licensed establishment" and that the use agreement "[c]ontain an affirmative statement that no inducement was offered or accepted regarding the placement or operation of video gaming terminals in a licensed establishment." 11 Ill. Adm. Code 1800.320(a), (b) (2010). Further, a use agreement must "[p]rohibit any assignment other than from a licensed terminal operator to another licensed terminal operator" and "[c]ontain a provision that releases the video gaming location from any continuing contractual obligation to the terminal operator in the event that the terminal operator has its license revoked *** or surrenders its license." 11 Ill. Adm. Code 1800.320(d), (e) (2010).

¶ 30    The Gaming Board's jurisdiction under the Act also includes the authority conferred by the Riverboat Gambling Act and the regulations promulgated thereunder, provided the terms of the two statutes do not conflict. 230 ILCS 40/80 (West 2012). Under the Riverboat Gambling Act, the Board has the authority to conduct hearings, require the attendance of witnesses, and compel the production of evidence in accordance with the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2014)) when the Board determines that it is necessary for the administration or enforcement of the Act or the Board's regulations. 230 ILCS 10/5(c)(9) (West 2014); 230 ILCS 40/80 (West 2014). The Board may discipline any licensee who fails to comply with the terms of the Act or the Board's regulations (11 Ill. Adm. Code 1800.310(a) (2010)), and the licensee may contest any disciplinary action through the hearing process prescribed by the Board's regulations (11 Ill. Adm. Code 1800.720-790 (2010)). 230 ILCS 10/5(c)(5) (West 2014); 230 ILCS 40/80 (West 2014). The Board's final decision is subject to review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014)). 230 ILCS 10/17.1 (West 2014); 230 ILCS 40/80 (West 2014). Further, the Board may "take any other action as may be reasonable or appropriate to enforce" the Act and the Board's regulations. 230 ILCS 10/5(c)(21), 40/80 (West 2014).

¶ 31    J&J Ventures, Action Gaming, and Accel argue that, although the General Assembly enacted legislation that created a new form of legalized gambling through the use of video gaming terminals, it did not explicitly divest the circuit courts of jurisdiction to adjudicate the

validity and enforceability of location agreements that provide for the placement and operation of such terminals. We disagree.

¶ 32     By legalizing the use of video gaming terminals for commercial gambling purposes, the legislature enacted a comprehensive statutory scheme, creating rights and duties that have no counterpart in common law or equity. Considered in its entirety, this statutory scheme demonstrates the legislature's explicit intent that the Gaming Board have exclusive jurisdiction over the video gaming industry and the use agreements that are a necessary prerequisite of engaging in that industry. The Act, therefore, confers authority on the Gaming Board to determine the validity and enforceability of contracts that purport to control the location and operation of video gaming terminals within licensed establishments.

¶ 33     The question remaining is whether the agreements at issue here fall within the purview of the comprehensive statutory scheme granting the Board exclusive jurisdiction over video gaming in Illinois. The underlying declaratory judgment actions are predicated on the contention that J&J Ventures has the exclusive right to place and operate video gaming terminals in the defendants' establishments, based on the exclusive location agreements and subsequent assignments. As the appellate court observed, resolution of those claims requires a determination of whether the contracts assigned to J&J Ventures are valid use agreements, which is a matter that falls within the exclusive province of the Board. 2015 IL App (5th) 140092, ¶ 30.

¶ 34     J&J Ventures and Action Gaming argue that, despite its exclusive jurisdiction and broad authority to supervise all video gaming operations in Illinois, the Board lacks authority to determine the validity of the location agreements because those contracts are not "use agreements" under the Act and the Board's regulations. According to J&J Ventures and Action Gaming, the location agreements are "precursor" contracts, the validity of which falls within the jurisdiction of the circuit courts. The Gaming Board counters that the location agreements must fall within the Board's exclusive jurisdiction because contracts relating to video terminal gaming are legal only if they comply with the Act and the corresponding regulations and because any such contract that does not comply with the Act and regulations is an illegal gambling contract. In addressing these arguments, we consider the nature of the location agreements through the lens of the governing statutory and regulatory framework.

¶ 35     The location agreements provide that the terminal operator and the licensed establishment will obtain the necessary licenses under the Act. In addition, the agreements expressly state that they are "for the purpose of placing and operating video gaming terminals" in the licensed establishments. The agreements require the terminal operator to provide all video gaming terminals in the licensed establishment and obligate the licensed establishment to allow terminals to be placed in a "prominent, gaming oriented spot in the building." The agreements obligate the licensed establishment to work with the terminal operator "to maximize gaming revenues for the benefit of both parties" and provide that the licensed establishment is "responsible for maintaining an adequate video gaming terminal fund, with the amount being determined by the Illinois Gaming Board."

¶ 36     The initial terms of the agreements "commence upon the date the first video gaming terminal described herein first operates in the [l]icensed [e]stablishment." Further, the agreements state that, in accordance with the Act, the after-tax profits of the video gaming operations are to be divided equally between the terminal operator and the licensed

establishment. The agreements also expressly acknowledge that nothing of value was offered or received in exchange for the execution of the agreements and that it is a violation of the Act to offer anything as an inducement for the procurement of a location.

¶ 37     The amendments to the location agreements state they were "necessary in order for the Agreement to comply with the [Act] and the rules and regulations promulgated thereunder." In addition, the amendments include a clause entitled "IGB Approval," stating that the location agreements and amendments "are subject to and contingent upon the [Gaming Board's] review of, and to the extent required by the [Board], consent to the use of this [a]mendment." This clause further states that the parties will modify the amendment "to comply with the requirements of the [Gaming Board] or any change in the [Act] or the rules and regulations promulgated thereunder."

¶ 38     We agree with the appellate court's conclusion that the agreements fall within the Board's exclusive jurisdiction because they purport to control the placement and operation of video gaming terminals within licensed establishments. See 2015 IL App (5th) 140092, ¶¶ 32, 62. In addition, we note that the agreements require each party to obtain the requisite license, and the agreements specifically provide that they take effect when the first video gaming terminal first operates in the licensed establishment—a circumstance that cannot occur unless and until the parties are licensed and the Board has approved the agreements. In addition, the agreements and amendments are "subject to and contingent upon" the Gaming Board's review and consent. These express conditions providing for licensure of the parties and Board approval further support the conclusion that the Board has exclusive jurisdiction to decide their validity and enforceability.

¶ 39     J&J Ventures and Action Gaming assert that the agreements are merely "precursor" contracts and, therefore, cannot be considered to be use agreements. We reject this assertion for two reasons. First, there is nothing about these fully negotiated agreements that can be characterized as preliminary in nature. The terms and conditions are definite, setting forth the rights and obligations of the parties. All of those rights and obligations relate to the placement of video gaming terminals and to the division of profits derived from the operation of those terminals. Also, the amended agreements are complete and do not require or contemplate the execution of any subsequent agreements or amendments, except as required to comply with the requirements of the Board or with any changes in the Act or the Board's regulations. Second, as noted above, the amended agreements specifically acknowledge that they are governed by the terms of the Act and the Board's regulations and also are "subject to" the Board's review and consent. These are restrictions that apply to use agreements. Therefore, the claim that the agreements are "precursor" contracts is refuted by the language of the agreements themselves.

¶ 40     Moreover, the argument of J&J Ventures and Action Gaming would lead to an anomalous result where the circuit court could determine that a contract for the placement and operation of video gaming terminals is valid but the court could not enforce the terms of that contract. Also, the Board would be bound by a judicial determination as to the validity and enforceability of such a contract. Such a circumstance directly conflicts with and undermines the exclusive and original jurisdiction of the Board to oversee all video gaming operations and to decide questions relating to the placement of video gaming terminals

within licensed establishments in Illinois. Therefore, the Board's jurisdiction necessarily includes jurisdiction over the agreements and assignments at issue in these appeals.

¶ 41 In urging a contrary result, J&J Ventures and Action Gaming cite representations of the Board indicating that the validity of prelicensure location agreements does not fall within the purview of the Act. In particular, they rely on forms and information relating to the application process, as well as comments made by an attorney of the Gaming Board. As recognized by the appellate court, however, these representations do not control the determination of the Board's jurisdiction, which is a judicial function and not a question for the agency itself. *County of Knox ex rel. Masterson v. The Highlands, L.L.C.*, 188 Ill. 2d 546, 554 (1999); see also 2015 IL App (5th) 140092, ¶ 64 (citing *Gallaher v. Hasbrouk*, 2013 IL App (1st) 122969, ¶ 19).

¶ 42 In sum, the General Assembly has enacted a comprehensive statutory scheme that vests jurisdiction over video gaming operations with the Illinois Gaming Board. The agreements at issue in these cases purport to control placement and operation of video gaming terminals, and the Illinois Gaming Board has exclusive, original jurisdiction to determine their validity and enforceability. Accordingly, we are precluded from addressing the merits of the parties' claims, as were the appellate court and the circuit courts. Our disposition renders unnecessary any discussion of the constitutional arguments raised by J&J Ventures and Action Gaming.

¶ 43                                  CONCLUSION

¶ 44 For the foregoing reasons, the judgments of the appellate court, vacating the circuit courts' judgments for lack of subject-matter jurisdiction and dismissing the appeals, are affirmed.

¶ 45 Appellate court judgments affirmed.