# Illinois Official Reports

## Appellate Court

---

*City of Chicago v. City of Kankakee*, 2017 IL App (1st) 153531

---

| | |
|---|---|
| Appellate Court Caption | THE CITY OF CHICAGO and THE VILLAGE OF SKOKIE, Plaintiffs-Appellants, v. THE CITY OF KANKAKEE; THE VILLAGE OF CHANNAHON; MTS CONSULTING, LLC; INSPIRED DEVELOPMENT LLC; MINORITY DEVELOPMENT COMPANY LLC; CORPORATE FUNDING SOLUTIONS; and CAPITAL FUNDING SOLUTIONS, Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-15-3531 |
| Filed | September 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 11-CH-29744, 11-CH-29745, 11-CH-34266; the Hon. Peter Flynn, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Stephen R. Patton and Edward N. Siskel, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Julian N. Henriques, Jr., Assistant Corporation Counsel, of counsel), for appellant City of Chicago.<br><br>Michael Lorge, Corporation Counsel, of Skokie (James McCarthy, Assistant Corporation Counsel, of counsel), for other appellant. |

Scott C. Solberg and James W. Joseph, of Eimer Stahl LLP, of Chicago, and James A. Murphy, of Mahoney, Silverman & Cross, LLC, of Joliet, for appellees City of Kankakee and the Village of Channahon.

Steven P. Blonder, of Much Shelist, P.C., of Chicago, and Scott A. Browdy, of Browdy P.C., of Deerfield, for other appellees.

Gino DiVito and Daniel I. Konieczny, of Tabet DiVito & Rothstein LLC, and Timothy L. Bertschy, John P. Heil, Jr., and Maura Yusof, of Heyl, Royster, Voelker & Allen, both of Chicago, for *amicus curiae* Regional Transportation Authority.

Kimball R. Anderson, Alan Lindquist, and Cara Lawson, of Winston & Strawn LLP, Michael J. Wynne, Jennifer Waryjas, and Douglas Wick, of Reed Smith LLP, Daniel M. Blouin and William J. Goldberg, of Seyfarth Shaw LLP, Catherine A. Battin, of McDermott, Will & Emery LLP, and Charles K. Schafer and Scott J. Heyman, of Sidley Austin LLP, all of Chicago, for *amici curiae* Dell Marketing L.P. *et al.*

Panel      PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justices Harris and Simon concurred in the judgment and opinion.

## OPINION

¶ 1      The City of Chicago and the Village of Skokie (collectively, plaintiffs) sued the City of Kankakee and the Village of Channahon (collectively, the municipal defendants), along with MTS Consulting, LLC, Inspired Development LLC, Minority Development Company LLC, Corporate Funding Solutions, and Capital Funding Solutions (collectively, the broker defendants) to recover tax revenue that was allegedly unjustly retained by the municipal defendants. Plaintiffs alleged that the municipal defendants, with the aid of the broker defendants, entered into sales tax rebate agreements with various retailers whereby the retailers would report to the State that the situs of certain online sales occurred within either Kankakee or Channahon, when in fact the sales occurred outside of Illinois. Plaintiffs claimed that, as a result of this scheme, the municipal defendants received a greater share of tax revenue from the sales by receiving the statutory local sales tax distribution rather than the lower statutory use tax distribution, thereby depriving plaintiffs of the statutory share of use tax revenue that plaintiffs would have received had the sales been properly reported as being subject to the use tax. Plaintiffs claimed that the municipal defendants offered the participating retailer tax rebates from the sales tax revenue that the municipal defendants received. Plaintiffs' third

- 2 -

amended complaint asserted claims of unjust enrichment against the defendants, and sought the imposition of constructive trusts. The Cook County circuit court dismissed plaintiffs' claims with prejudice and denied plaintiffs' motion for leave file a fourth amended complaint. Plaintiffs appeal. For the following reasons, we reverse and remand.

¶ 2                                    BACKGROUND

¶ 3     The City of Chicago, the Regional Transportation Authority (RTA), and Cook County initiated separate actions against the municipal defendants and MTS Consulting, LLC, Inspired Development LLC, and Minority Development Company LLC.[1] This appeal concerns only case No. 11 CH 29745 and the claims brought by Chicago and Skokie against the municipal defendants and the broker defendants.

¶ 4     On December 13, 2013, plaintiffs filed a third amended complaint against defendants. For purposes of this appeal, because the circuit court either dismissed the third amended complaint for failing to state a cause of action under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2014)) or for lack of subject-matter jurisdiction under section 2-619(a)(1) of the Code (735 ILCS 5/2-619(a)(1) (West 2014)), we recite and accept as true all well-pleaded facts alleged in plaintiffs' third amended complaint and draw all reasonable inferences from these facts in favor of plaintiffs (*Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 164 (2003)) in our *de novo* review.

¶ 5     Broadly speaking, Illinois imposes a tax on the sale of tangible personal property sold by out-of-state retailers that do not have a presence in Illinois where the item is used within Illinois. This is usually referred to as a "use tax." Illinois also imposes a tax on retailers that have an Illinois presence for the privilege of conducting retail sales in Illinois and for the services and advantages provided by the state and benefitting the retailers. This tax is usually referred to as the "sales tax." The retailer is required to file periodic returns with the state reporting its gross sales subject to either the sales tax or the use tax. The "use tax" and the "sales tax" are both set by statute at 6.25% of the sale price. From the out-of-state retailers' perspective, it does not matter whether the sale is subject to the sales or use tax because the amount the retailer is required to remit to the state is the same: 6.25%. However, the classification reported by the out-of-state retailer is important to a municipality because of the statutory scheme that redistributes a portion of these tax revenues back to the municipalities and, to a lesser extent, other state entities.

¶ 6     Under the statutory framework devised by the legislature, sales tax proceeds of 6.25% are distributed 5% to the state and 1.25% to the municipality and county where the sale occurred. Under the statutory framework devised by the legislature, use tax proceeds of 6.25% are distributed 5% to the state, and 1.25% is deposited into a common fund. From this common fund, the Illinois Department of Revenue (IDOR) periodically distributes 20% of the fund to Chicago, 10% to the RTA, 0.06% to the Madison County Mass Transit District, and $3.15

---

[1]The Regional Transportation Authority's suit was assigned case No. 11 CH 29744, Chicago's suit was assigned case No. 11 CH 29745 (which the Village of Skokie subsequently joined as an additional plaintiff and to which Corporate Funding Solutions and Capital Funding Solutions were added as additional defendants), and Cook County's suit was assigned case No. 11 CH 34266. The circuit court consolidated the three cases.

million to the Build Illinois Fund, and the remainder of the fund is distributed to more than 200 municipalities based on their proportionate share of the state population.

¶ 7    From this broad general outline of the sales tax and use tax distribution scheme as it relates to out-of-state retail sales, it should be apparent that how an out-of-state taxable sale is reported by the retailer to IDOR has a demonstrable effect on the amount of money that a municipality receives from taxable retail sales: municipalities get more from a local sale subject to the sales tax and substantially less from a sale subject to the use tax.

¶ 8    Plaintiffs alleged that beginning in 2000, the City of Kankakee and the Village of Channahon each sought to convince various out-of-state retailers to declare taxable retail sales as "sourced" to the respective municipality and subject to the sales tax. In return, the municipal defendants agreed to rebate portions of the sales tax revenue received from the reported retail sales declared to IDOR as having taken place within the border of the municipalities. The municipal defendants entered into rebate agreements with the retailers either directly or through the broker defendants. By having the retailers declare that the sales took place within the defendant municipalities, the municipal defendants received 1% of the sales tax revenue from the sales,[2] which was an amount greater than what the municipal defendants would receive from the use tax fund based on the municipalities' proportionate share of the state population. For purposes of this appeal, a retailer generally does not receive any portion of either the use tax or the sales tax it collects or remits to the state.[3]

¶ 9    Plaintiffs claimed that, as a result of these improper rebate agreements, Chicago (20% share) and Skokie (proportionate share of 0.5% based on state population) were deprived of the share of the use tax revenue that would have been deposited into the State and Local Sales Tax Reform Fund had the taxable sales been correctly reported as being subject to the use tax rather than falsely reported as being subject to the sales tax.

¶ 10    In count I of the third amended complaint, plaintiffs alleged that the out-of-state internet retailers participated in the rebate agreements either directly or through the brokers. Plaintiffs further alleged that offices maintained within the municipalities "on behalf of the [i]nternet [r]etailers, either directly or through the [b]rokers, were in fact offices where little or no meaningful sales activity took place," and "all significant sales activities, including the [i]nternet [r]etailers' acceptance of their customers' orders, took place outside of Illinois." Plaintiffs did not yet have sufficient information "to determine which sales of which businesses should and would have been reported as subject to the state use tax rather than the state sales tax in the absence of the rebate agreements" or whether additional retailers might be involved. Plaintiffs requested (1) a declaration that certain sales by the internet retailers were subject to the state use tax rather than the state sales tax, (2) the imposition of a constructive trust on the municipal defendants and broker defendants for all sales tax proceeds resulting from the improperly reported retail sales, along with an equitable accounting and the return of

---

[2]We describe the distribution formula in further detail below. See *infra* ¶ 28 n.10.

[3]Plaintiffs' third amended complaint also sought relief from the municipal defendants and broker defendants with respect to transactions involving businesses other than the internet retailers (described as "operating companies" and "procurement subsidiaries"). Plaintiffs, however, are no longer pursuing claims related to those entities, and thus we omit any discussion of plaintiffs' claims in count II of the third amended complaint.

- 4 -

plaintiffs' property, and (3) compensatory damages in the amount of use tax revenue that plaintiffs lost as a result of the improper rebate agreements.

¶ 11    Attached to the amended complaint were two exhibits. Exhibit A was a "marketing piece" generated by MTS Consulting, which purportedly described the rebate agreement program and how to convert taxable purchases into taxable sales. Exhibit B was a memorandum drafted by Donald Sloan, who formed defendant Inspired Development. Sloan's memorandum contained a "virtual blueprint" for converting use tax obligations into sales tax obligations in Kankakee in order to obtain a rebate.

¶ 12    On April 30, 2015, plaintiffs sought leave to file a fourth amended complaint. The proposed fourth amended complaint contained eight counts, four of which are relevant on appeal,[4] and sought to add eleven internet retailers as defendants.[5] The allegations in the proposed fourth amended complaint were largely the same as the allegations contained in the third amended complaint. Count I sought a declaration that certain sales by the internet retailers were subject to the state use tax rather than the state sales tax. Count II sought the imposition of a constructive trust on the municipal defendants and broker defendants "as a result of the unjust enrichment described herein" for all improperly designated retail sales, along with an equitable accounting and the return of plaintiffs' property, and compensatory damages in the amount of use tax revenue that plaintiffs lost as a result of the questioned rebate agreements. Counts III and IV of the proposed fourth amended complaint were directed at the internet retailers. Count III sought a declaration that certain sales by the internet retailers were subject to the use tax rather than the sales tax. Count IV sought the imposition of a constructive trust on the internet retailers "as a result of the unjust enrichment described herein" for all improperly received rebates as a result of improperly reported sales tax transactions rather than use tax transactions on designated retail sales, along with an equitable accounting and the return of plaintiffs' property, and compensatory damages in the amount of the use tax revenue that plaintiffs lost as a result of rebate agreements. Channahon and the proposed internet retailer defendants filed responses to plaintiffs' motion for leave to file the fourth amended complaint.

¶ 13    After a hearing and argument, by written order dated October 9, 2015, the circuit court denied plaintiffs' motion for leave to file a fourth amended complaint. First, the circuit court observed that all of plaintiffs' claims related to conduct that occurred prior to our supreme court's decision in *Hartney Fuel Oil Co. v. Hamer*, which prospectively invalidated IDOR's regulations related to determining the proper situs of a sale for purposes of imposing sales taxes. 2013 IL 115130, ¶ 67. Next, the circuit court found that plaintiffs were not entitled to injunctive relief because it was undisputed that the conduct complained of had ceased, and therefore the plaintiffs could only sue for damages related to past conduct. The circuit court

---

[4]Counts V through VIII of the proposed fourth amended complaint alleged claims against the operating companies and the procurement subsidiaries referenced *supra* in footnote 3 and sought to add additional defendants. Plaintiffs are not pursuing any appellate relief regarding the claims set forth in counts V through VIII against any of the operating companies or procurement subsidiaries.

[5]The proposed defendants were Cabela's Inc. and affiliated Cabela's companies, CompuCom Systems, Inc., Dell Marketing LP, Hewlett-Packard Company, HSN Inc., Lenovo (United States) Inc., McKesson Purchasing Company, LLC, NCR Corp., Shaw Industries, Inc., WESCO Distribution, Inc., and affiliated WESCO companies, and Williams-Sonoma, Inc., and affiliated Williams-Sonoma companies.

- 5 -

also found that the plaintiffs "could not properly sue [the internet retailers] in the way they propose" because "[t]o hold otherwise would subvert the Illinois sales and use tax system, empower an unwieldy and potentially disruptive form of municipal vigilante tax litigation, and undermine (if not outright undo) the careful balance struck by the General Assembly" in section 8-11-21 of the Illinois Municipal Code (65 ILCS 5/8-11-21 (West 2014)).[6] The circuit court found that counts II and IV of the proposed fourth amended complaint did not and could not allege any cause of action because the brokers and the internet retailers were not in possession of anything belonging to plaintiffs—the taxes paid to IDOR did not "belong" to plaintiffs—and that plaintiffs could not assert any claim to the rebates paid by the municipalities to the brokers and internet retailers because plaintiffs were not parties to the rebate agreements. The circuit court observed that the municipal defendants might have a claim for restitution against the brokers or internet retailers for the rebates. The circuit court determined that there was no connection between plaintiffs and the rebates that could sustain an unjust enrichment claim because any enrichment to the brokers and internet retailers came from the municipalities in the form of the rebate payments. And because plaintiffs could not state claims for unjust enrichment or restitution, plaintiffs' constructive trust claims also failed.

¶ 14    Next, the circuit court considered whether the plaintiffs could bring unjust enrichment claims or seek restitution against the municipal defendants. The circuit court concluded that IDOR has the authority to enforce tax collection and to distribute taxes and that granting plaintiffs any relief would require IDOR's involvement because recomputing and redistributing use taxes is within IDOR's statutory authority and expertise. The circuit court distinguished the present case from *Village of Itasca v. Village of Lisle*, 352 Ill. App. 3d 847 (2004), in which Itasca sued Lisle to recover allegedly missourced sales tax revenue, because *Village of Itasca* did not involve use taxes, was a much simpler fact pattern, and because the relief sought could be provided without resort to IDOR. The circuit court observed that section 8-11-21 of the Illinois Municipal Code (65 ILCS 5/8-11-21 (West 2014)) provided a statutory basis for a municipality to sue another municipality for sales taxes that have been missourced but that, here, the basis for plaintiffs' claims was missourced use taxes, which is not authorized by the statute. The circuit court further observed that plaintiffs' claims "raised questions of mass litigation" that could "[open] the courts to large (potentially unlimited) numbers of [tax] disputes in the courts, thereby undercutting IDOR's authority." The circuit court found that, even if the court could decide in favor of the plaintiffs, the remedy "would require the local share that was improperly distributed to the [municipal defendants] under the [Retailers Occupation Tax Act], to be repaid by them to IDOR and then re-distributed by IDOR not just to [plaintiffs], but rather to multiple entities pursuant to the [Use Tax Act] distribution scheme." The circuit court noted that IDOR "knows how to achieve that goal," while the circuit court "has no such experience," and that IDOR has the authority to correct errors in tax distribution. The circuit court also found that case law addressing "improper distribution of tax refunds has done so in the context of a pre-existing IDOR audit." See *City of Kankakee v. Department of Revenue*, 2013 IL App (3d) 120599; see also *City of Champaign v. Department of Revenue*, 89 Ill. App. 3d 1066 (1980).

---

[6]In the original, first amended, and second amended complaints, plaintiffs pursued claims under section 8-11-21 of the Illinois Municipal Code against the municipal defendants. These claims were abandoned when they were not set forth in the third amended complaint or in the proposed fourth amended complaint.

¶ 15    The circuit court's written order of October 9, 2015, stated that "[t]he claims of the City of Chicago and the Village of Skokie are dismissed, with prejudice." (Emphasis omitted.) The circuit court found that its order "fully disposes of the claims of [the City of Chicago and the Village of Skokie], and because those claims are conceptually separate from the claims of the remaining plaintiffs herein, *** there is no just reason for delay or enforcement of or appeal from this [o]rder."

¶ 16    Plaintiffs moved to reconsider and tendered a revised proposed fourth amended complaint that removed plaintiffs' declaratory judgment claims from the proposed fourth amended complaint. Relevant to the issues on appeal, count I of the proposed fourth amended complaint asserted an unjust enrichment claim against the internet retailers, and count II asserted a claim of unjust enrichment against the municipal defendants and broker defendants.[7] Plaintiffs' motion to reconsider argued that unjust enrichment claims can be brought even where the benefit the plaintiff seeks to recover from the defendant was given to the defendant by a third party rather than by the plaintiff and that unjust enrichment claims do not require wrongful conduct by a defendant. Plaintiffs also argued that IDOR had neither exclusive nor primary jurisdiction over plaintiffs' claims against the municipalities.

¶ 17    On November 13, 2015, the circuit court heard and denied plaintiffs' motion to reconsider "for the reasons set forth in [the circuit court's] October 9, 2015, order and the court's clarification stated in open court and on the record today." Plaintiffs filed a timely notice of appeal on December 11, 2015, from the October 9 and November 13 orders.

¶ 18    During the pendency of this appeal, we allowed the RTA to file *amicus curiae* brief in support of the plaintiffs. We also allowed Dell Marketing L.P., Hewlett Packard Company, Wesco Distribution, Inc., HSN, Inc., Cabela's Retail IL, Inc., Cabela's Wholesale, Inc., Cabela's Catalog, Inc., Cabela's Marketing & Brand Management, Inc., and NCR Corporation ("specified proposed internet retailer defendants") to file an *amicus curiae* brief in support of the defendants. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 19                              ANALYSIS

¶ 20    As an initial matter, we strike the *amicus* brief of the specified proposed internet retailer defendants. The purpose of an *amicus* brief is to advise or make suggestions to the court. *In re J.W.*, 204 Ill. 2d 50, 73 (2003). Here, however, the proposed internet retailer defendants' brief simply restates the arguments advanced by the municipal defendants and the broker defendants. This falls short of the criteria our supreme court examined when denying a motion for leave to file an *amicus* brief in Kinkel v. Cingular Wireless, LLC, No. 100925 (Ill. Jan. 11, 2006) (order), in which the court explained that "[b]riefs which essentially restate arguments advanced by the litigants are of no benefit to the court or the adversarial process." Here, the proposed internet retailer defendants' *amicus* brief does not provide any unique perspective or information that aids us in resolving this appeal, and provides no insights into the merits of this

---

[7]Counts III and IV of the revised proposed fourth amended complaint sought relief in connection with sales involving the procurement companies referenced above. See *supra* ¶ 8 nn. 2-3. Count V of the revised proposed fourth amended complaint sought an order requiring IDOR to "reallocate the Local Share of the tax revenue derived from the sales at issue in this case, should the [c]ourt determine that such reallocation is appropriate in lieu of the direct payments requested in Counts I through IV." Plaintiffs raise no appellate arguments related to these claims.

case beyond those provided by the municipal defendants and the broker defendants. See *id.* Our order granting the proposed internet retailer defendants leave to file an *amicus* brief was improvidently granted, and we therefore strike the brief in its entirety.

¶ 21 Returning to the instant appeal, the plaintiffs raise two arguments. First, plaintiffs argue that the third amended complaint stated claims for unjust enrichment against the municipal defendants and the broker defendants and that the proposed fourth amended complaint stated unjust enrichment claims against the municipal defendants, the broker defendants, and the proposed internet retailer defendants. Second, plaintiffs argue that the circuit court had subject-matter jurisdiction over plaintiffs' claims against the municipal defendants, and that plaintiffs can and did allege unjust enrichment claims against the municipal defendants. In response, the municipal defendants and the broker defendants argue that the circuit court lacked subject-matter jurisdiction over all plaintiffs' unjust enrichment claims because IDOR has exclusive jurisdiction to assess, collect, distribute, and redistribute tax revenue. Defendants primarily rely on our supreme court's decision in *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, contending that the supreme court has clarified the analysis for determining when an administrative agency has exclusive jurisdiction. Because defendants' argument is that IDOR has exclusive subject-matter jurisdiction, which renders the entire controversy ineligible for resolution in the circuit court, we will first address whether the circuit court has subject-matter jurisdiction over plaintiffs' claims.

¶ 22 The Illinois Constitution provides that "Circuit Courts shall have original jurisdiction of all justiciable matters" except for two exceptions not present here. Ill. Const. 1970, art. VI, § 9. The legislature may "vest original jurisdiction in an administrative agency when it enacts a comprehensive statutory scheme that creates rights and duties that have no counterpart in common law or equity." *J&J Ventures*, 2016 IL 119870, ¶ 23; see also *Zahn v. North American Power & Gas, LLC*, 2016 IL 120526, ¶ 14. Determining whether the legislature intended to divest the circuit court of original jurisdiction over a justiciable matter requires considering a statutory administrative scheme as a whole. *J&J Ventures*, 2016 IL 119870, ¶ 24. Previously, in *Employers Mutual Cos. v. Skilling*, our supreme court stated that "if the legislative enactment does divest the circuit courts of their original jurisdiction through a comprehensive statutory administrative scheme, it must do so explicitly." 163 Ill. 2d 284, 287 (1994). Recently in *J&J Ventures*, the court further examined *Skilling* and explained that *Skilling* does not "represent the full measure of this court's jurisprudence in ascertaining legislative intent to vest exclusive jurisdiction in an administrative agency." *J&J Ventures*, 2016 IL 119870, ¶ 24. Instead, the supreme court instructed that, on questions relating to whether an administrative agency has exclusive subject-matter jurisdiction, we are to look to the statutory framework as a whole in order to give effect to the intent of the legislature. *Id.* ¶ 25. We may also consider "the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute in one way or another." *Id.* The scope of the circuit court's jurisdiction and questions of statutory interpretation are both questions of law that we review *de novo*. *Id.*

¶ 23 Defendants primarily rely on our supreme court's decision in *J&J Ventures* to argue that IDOR has exclusive jurisdiction over the issues presented in the case. Plaintiffs' appellant's

brief did not address the jurisdictional analysis set forth in *J&J Ventures*.[8] In plaintiffs' reply brief, however, plaintiffs argue that neither the Retailers' Occupation Tax Act nor the Use Tax Act "[identify] the precise powers those statutes confer—and do not confer—on IDOR or the courts." Plaintiffs further argue that because all of the taxpayers claimed that there were no reporting errors, IDOR "did not have authority to correct any errors under section 2505-475 [of the Department of Revenue Law (20 ILCS 2505/2505-475 (West 2016))]."

¶ 24    In *J&J Ventures*, our supreme court addressed whether the legislature intended to vest the Illinois Gaming Board with exclusive jurisdiction to determine the validity of agreements that affect the placement of video gaming terminals in licensed establishments. 2016 IL 119870, ¶ 25. The parties, relying on *Skilling*, argued that the circuit court had subject-matter jurisdiction because the legislature did not explicitly divest the circuit court of jurisdiction in the Video Gaming Act (230 ILCS 40/1 *et seq.* (West 2014)). *J&J Ventures*, 2016 IL 119870, ¶ 24. The court rejected that argument because "*Skilling*'s description of the analysis in [*People v. NL Industries*, 152 Ill. 2d 82, 96-98 (1992),] is truncated and does not represent the full measure of this court's jurisprudence in ascertaining legislative intent to vest exclusive jurisdiction in an administrative agency." *J&J Ventures*, 2016 IL 119870, ¶ 24. The court explained that "*NL Industries* considered the relevant statute as a whole, and the court referenced not only the lack of exclusionary language but also other statutory provisions that specifically referred to the circuit courts' ability to adjudicate the questions at issue." *Id.* The court proceeded to examine the Video Gaming Act as a whole and found that the Act expressly vested the Gaming Board with authority to administer the Act. *Id.* ¶ 27. The legislature provided that the Gaming Board "shall have jurisdiction over and shall supervise all gaming operations governed by [the] Act." (Internal quotation marks omitted.) *Id.* The Video Gaming Act expressly provided the Gaming Board with authority to promulgate rules and regulations with respect to eligibility for licenses, the license application process, and for hearings in connection with denials of license applications. *Id.* ¶ 28. The Video Gaming Act also expressly included the authority granted to the Gaming Board under the Riverboat Gambling Act (230 ILCS 10/1 *et seq.* (West 2014)), which included the power to conduct hearings, require the attendance of witnesses, compel production of evidence, and impose discipline on licensees. *Id.* ¶ 30. The court concluded that the legislature had enacted a comprehensive statutory scheme that created gambling rights with no counterpart in common law or equity. *Id.* ¶ 32. The court also noted that a finding that the circuit court had jurisdiction would produce the anomalous result that the circuit court could uphold the placement agreements in question but could not enforce agreements' terms. *Id.* ¶ 40. The Gaming Board, which has exclusive authority to determine whether a party was a licensee or whether an establishment could have a video terminal, would be bound by a judicial determination despite the Video Gaming Act giving the Gaming Board the authority to "decide questions relating to the placement of video gaming terminals within licensed establishments." *Id.*

¶ 25    We first observe that our legislature has vested the authority to levy, assess, and collect sales tax and use tax in IDOR. Levying, assessing, and collecting these taxes is entirely governed by statute with no counterpart in common law or equity. See *People ex rel. Shirk v. Glass*, 9 Ill. 2d 302, 311 (1956) ("The levy, assessment and collection of taxes are purely

---

[8]The supreme court issued its opinion in *J&J Ventures* on September 22, 2016. Plaintiffs' appellant's brief was filed October 24, 2016.

statutory and the levy, assessment and collection of taxes can only be made as expressly pointed out in the statute."). Section 2505-25 of the Department of Revenue Law provides that IDOR "has the power to administer and enforce all the rights, powers, and duties contained in the Retailers' Occupation Tax Act [(sales tax)] to collect all revenues thereunder and to succeed to all the rights, powers, and duties previously exercised by the Department of Finance in connection therewith." 20 ILCS 2505/2505-25 (West 2016). Similarly, section 2505-90 of the Department of Revenue Law provides that IDOR "has the power to exercise all the rights, powers, and duties vested in [IDOR] by the Use Tax Act." 20 ILCS 2505/2505-90 (West 2016). Furthermore, IDOR is vested with "the power to make reasonable rules and regulations that may be necessary to effectively enforce" its powers under the Retailers' Occupation Tax Act and the Use Tax Act. 20 ILCS 2505/2505-795 (West 2016). IDOR has adopted administrative rules with respect to administering the Retailers' Occupation Tax Act (see 86 Ill. Adm. Code 130), and the Use Tax Act (see 86 Ill. Adm. Code 150).

¶ 26     We previously noted that Illinois imposes a tax on all retail sales made within the state's border, as well as a tax on personal property purchased at retail outside of the state for use in Illinois. IDOR is responsible for levying and collecting both the sales tax and use tax. Retail purchases made within the state are subject to the sales tax under section 2 of the Retailers' Occupation Tax Act (35 ILCS 120/2 (West 2016)). Retail purchases made outside of Illinois for use within the state are subject to the use tax under section 3 of the Use Tax Act (35 ILCS 105/3 (West 2016)). The "general rate" for both the sales tax and use tax is 6.25% of the retail sale, and the state retains 5% of the retail sale price with the remaining 1.25% distributed according to specified statutory provisions depending on whether a sales or use tax is involved.

¶ 27     For retail sales subject to the sales tax under Retailers' Occupation Tax Act, the retailer is responsible for filing tax returns with IDOR that report the address of the retailer's business and the amount of its gross receipts. 35 ILCS 120/3 (West 2016). The retailer must remit to IDOR the sales tax owed on those receipts. *Id.* For retail sales subject to the Use Tax Act, retailers that have a presence in Illinois and that sell merchandise from outside of Illinois for use within the state must collect and remit a use tax on those sales. 35 ILCS 105/3-45 (West 2016). IDOR may also authorize a retailer that does not have a presence in Illinois that sells merchandise from locations outside Illinois for use within the state to collect a use tax on those sales. 35 ILCS 105/6 (West 2016).[9] All retailers that are required or authorized to collect the use tax must periodically file tax returns with IDOR declaring the amount of use tax collected during that period, and remit the use tax collected to IDOR. 35 ILCS 105/9 (West 2016). Under IDOR rules in effect at the time of the events in this case, the situs of a retail sale was the location where the purchase order was accepted. 86 Ill. Adm. Code 130.610, repealed at 38 Ill. Reg. 19998 (eff. Oct. 1, 2014). IDOR collects taxes on all purchases at retail at the 6.25% general rate applicable to both sales tax or use tax.

¶ 28     IDOR is also responsible for distributing the sales tax and use tax revenue it collects. Under both the sales and use taxes, IDOR first allocates 5% of the retail sale to the State and then allocates the remaining 1.25% depending on whether the sale was subject to the sales tax or use tax. For retail sales subject to the sales tax, the municipality in which the sale occurs receives revenue equal to 1% of the retail price, and the county in which the sale occurs receives the

_____

[9]If a retailer does not have a place of business in Illinois and is not required by IDOR to collect and remit the use tax, the obligation to pay the use tax falls on the purchaser.

- 10 -

remaining 0.25% the retail price.[10] 35 ILCS 120/3 (West 2016); 30 ILCS 105/6z-18, 6z-20 (West 2016). For retail sales subject to the use tax, the remaining 1.25% is deposited into the State and Local Sales Tax Reform Fund (30 ILCS 105/6z-17 (West 2016)), which is administered by IDOR. Every month, IDOR disburses funds according to the following formula set forth in section 6z-17 of the State Finance Act: 20% to City of Chicago, 10% to the Regional Transit Authority Occupation and Use Tax Replacement Fund, 0.6% to the Madison County Mass Transportation District, $3.15 million to the Build Illinois Fund, and the remainder to approximately 200 municipalities (other than Chicago) and counties based on population. 30 ILCS 105/6z-17(a) (West 2016).

¶ 29    Various sales and use tax statutory provisions give IDOR the authority to examine and correct tax returns, conduct investigations and hearings, and to make corrections in records and disbursements. Section 8 of the Retailers' Occupation Tax Act provides in part:

"For the purpose of administering and enforcing the provisions of this Act, [IDOR] *** may hold investigations and hearings not otherwise delegated to the Illinois Independent Tax Tribunal concerning any matters covered by this Act and may examine any books, papers, records or memoranda bearing upon the sales of tangible personal property or services of any such person, and may require the attendance of such person or any officer or employee of such person, or of any person having knowledge of such business, and may take testimony and require proof for its information." 35 ILCS 120/8 (West 2016).

Similarly, Section 11 of the Use Tax Act provides in part:

"For the purpose of administering and enforcing the provisions hereof, [IDOR], or any officer or employee of [IDOR] designated, in writing, by the Director thereof, may hold investigations and hearings concerning any matters covered herein and may examine any books, papers, records, documents or memoranda of any retailer or purchaser bearing upon the sales or purchases of tangible personal property, the privilege of using which is taxed hereunder, and may require the attendance of such person or any officer or employee of such person, or of any person having knowledge of the facts, and may take testimony and require proof for its information." 35 ILCS 105/11 (West 2016).

Section 4 of the Retailers' Occupation Tax Act (which is also applicable to the Use Tax Act pursuant to section 12 of the Use Tax Act (35 ILCS 105/12 (West 2016)), vests IDOR with authority to examine all tax returns, make corrections "according to its best judgment and information," provide notice of any changes it makes, issue notices of tax liability, impose penalties, entertain protests and requests for hearings and rehearings, and issue final assessments. 35 ILCS 120/4 (West 2016). Furthermore, section 2505-475 of the Department of

---

[10]More specifically, IDOR is required to deposit an amount equal to 4% of the sales tax from a retail sale into the County and Mass Transit District Fund, which equals 0.25% of the retail sale (6.25% x 4% = 0.25%). 35 ILCS 120/3 (West 2016). IDOR then distributes that 0.25% to the county in which the retail sale occurred. 30 ILCS 105/6z-18 (West 2016). Likewise, IDOR is required to deposit an amount equal to 16% of the sales tax from a retail sale into the Local Government Tax Fund, which equals 1% of the retail of sale (6.25% x 16% = 1%). 35 ILCS 120/3 (West 2016). IDOR then distributes that 1% to the municipality in which the retail sale occurred (or the county if the retail sale occurred in an unincorporated area). 30 ILCS 105/6z-20 (West 2016).

Revenue Law provides that IDOR has the power to correct errors in its records, and that if the error "is due to a mistake in reporting by the taxpayer and the taxpayer agrees that he or she has made a reporting error that should be corrected, [IDOR] may correct its records accordingly." 20 ILCS 2505/2505-475 (West 2016). And section 6z-18 of the State Finance Act, which governs disbursements from IDOR to the Local Government Tax Fund, states in part:

> "When certifying the amount of monthly disbursement to a municipality or county under this Section, [IDOR] shall increase or decrease that amount by an amount necessary to offset any misallocation of previous disbursements. The offset amount shall be the amount erroneously disbursed within the 6 months preceding the time a misallocation is discovered." 30 ILCS 105/6z-18 (West 2016).

¶ 30    Taken together, clearly the legislature has enacted a comprehensive statutory scheme that vests IDOR with exclusive jurisdiction to levy, collect, and distribute sales tax and use tax revenue under the Retailers' Occupation Tax Act and the Use Tax Act. Our legislature delegated to IDOR broad investigatory authority, the authority to examine, correct, and adjust tax returns, to examine records or individuals in connection with previously-filed tax returns, issue refunds or notices of tax liability, and to adjust current tax liability based on changes IDOR made to prior tax returns, along with the power to conduct hearings and issue final assessments relative to tax liability.

¶ 31    But here, the gist of plaintiffs' claims sounds in the equitable claim of unjust enrichment and essentially seeks from defendants the monies plaintiffs would have received had the out-of-state sales been correctly reported as subject to the use tax but for the improper rebate agreements where the retailers, in conjunction with the municipal defendants and the broker defendants, falsely declared that the sales were subject to the sales tax. Contrary to the defendants' arguments, plaintiffs are not seeking to "re-tax" the sales or impose a new tax liability on the retailers, nor do plaintiffs seek a "redistribution" of previously distributed tax revenue—plaintiffs are simply attempting to disgorge the municipal defendants of an amount equal to the use tax revenue that plaintiffs would have received had the municipal defendants and retailers not agreed to purposely missource the situs of certain out-of-state sales. In our view, plaintiffs are not attempting to usurp IDOR's authority regarding the assessment, collection, remittance, or distribution of the sales tax or use tax. Nor are plaintiffs claiming that the amount of tax collected and remitted by the retailers was incorrect or resulted in an underpayment of taxes due, which might require IDOR to make adjustments to the defendant municipality's future tax liabilities. The gist of plaintiffs' complaint is that plaintiffs would have received a portion of the use tax (part of the 1.25%) but because of the questioned rebate agreements and the intentional missourcing of the situs of the sales, the municipal defendants received essentially all of the 1.25% and shared it with the defendant retailers. Under plaintiffs' theory, the municipal defendants would have received substantially less tax revenue if the sales were correctly reported as subject to the use tax, but the municipal defendants were unjustly enriched under rebate agreements where the municipal defendants agreed with the retailers to falsely declare out-of-state retail sales as sales that occurred in the respective municipality, which enabled the defendants to receive the lion's share of the 1.25% tax, and then shared part of this unjust windfall with the broker and retailer defendants. Plaintiffs' equitable claims are not within the contemplation of the statutory scheme devised by the legislature and are, therefore, neither preempted by nor overlap with IDOR's exclusive authority to assess, collect, remit, or distribute sales tax or use tax.

¶ 32    The defendants contend that section 8-11-21 of the Illinois Municipal Code (65 ILCS 5/8-11-21 (West 2014)), which permits a municipality to bring suit against another municipality for damages, costs, and fees incurred due to an agreement to share or rebate sales tax revenue with a retailer, indicates that the legislature has never authorized a municipality to sue another municipality for "misallocated use tax revenues" and that the legislature has vested IDOR with authority to redistribute use tax revenue sourced to the wrong municipality. We disagree. Section 8-11-21 of the Illinois Municipal Code sought to address the harm caused to a municipality resulting from missourced sales tax revenue. We see nothing in section 8-11-21 of the Illinois Municipal Code to suggest that the legislature was aware of a similar problem involving the intentional or mistaken missourcing of the situs of out-of state retail sales and that it intended to prohibit any municipality from attempting to recover what it was due. The alleged rebate agreements at issue here result in nearly the exact same injury as those sought to be remedied by section 8-11-21 of the Illinois Municipal Code: a municipality being deprived of tax revenue that it would have received but for an agreement to missource the situs of the retail sale. For us to conclude that plaintiffs' claims are precluded by a statute designed to remedy an essentially identical harm would be absurd. We find nothing in section 8-11-21 of the Illinois Municipal Code that evinces a legislative intent to preclude a municipality from suing another municipality to recover use tax revenue to which it would otherwise have been entitled. As discussed, plaintiffs' unjust enrichment claims are neither preempted by, nor overlap with, IDOR's exclusive authority to assess, collect, remit, or distribute the sales tax or the use tax. Therefore, we find IDOR does not have exclusive jurisdiction over the equitable claims at issue here, which seek to recover use tax revenue based on an alleged scheme between a municipality and retailers to deliberately missource retail sales.[11]

¶ 33    On the issue of whether our finding that the circuit court has jurisdiction over the plaintiffs' claims would result in adverse consequences, we reject the defendants' arguments that allowing plaintiffs to pursue unjust enrichment claims will invite chaos and mayhem. As discussed, plaintiffs are not seeking to assess, collect, remit, or distribute tax revenues. Nor are plaintiffs seeking to hold the retailers accountable for failing to remit any portion of any tax. Instead, accepting as true the well-pleaded allegations, plaintiffs seek recovery of an amount equal to the use tax revenue that should have been paid to plaintiffs but for the alleged scheme to deliberately missource and divert use tax revenue by falsely declaring the situs of the out-of-state retail sales. This dispels any notion that the plaintiffs are engaged in some form of "tax vigilantism." Defendants argue that we must consider that "[t]here would be nothing to stop the more than 200 other Illinois home rule municipalities [that] are not before the [c]ircuit [c]ourt from seeking to impose through crazy-quilt litigation the same or similar liability in

_____

[11]We do note, however, that plaintiffs' reliance on *Village of Itasca* and *State ex rel. Beeler, Schad & Diamond, P.C. v. Ritz Camera Centers, Inc.*, 377 Ill. App. 3d 990 (2007), as support for the position that the circuit court had subject-matter jurisdiction over the claims at issue here is misplaced. In both of those cases, we expressly relied on the rule in *Skilling* that required an explicit divestment of circuit court jurisdiction. *Village of Itasca*, 352 Ill. App. 3d at 853; *Ritz Camera*, 377 Ill. App. 3d at 1006-07. But as explained, *J&J Ventures* and *Zahn* explain that the absence of an explicit divestiture of circuit court jurisdiction in a statute does not mean that the legislature did not intend to divest the circuit court of subject-matter jurisdiction. *J&J Ventures* did not expressly overrule *Skilling*, but we believe that the jurisdictional analysis employed in *Village of Itasca* and *Ritz Camera* is no longer persuasive authority regarding subject-matter jurisdiction in this regard.

- 13 -

their own judicial districts at a time of their choosing." That other municipalities were similarly deprived of revenue by these schemes or similar schemes may very well be true. But as discussed, the equitable claims at issue here do not involve tax enforcement or an attempt to retax the defendants—plaintiffs allege that the defendants engaged in a rebate program designed to falsely identify retail sales as being subject to the sales tax instead of the use tax, thereby depriving plaintiffs of an identifiable amount of tax revenue wrongfully diverted to defendants. This finding that the circuit court has jurisdiction over plaintiffs' claims does not set the stage for "crazy-quilt" litigation over claims involving assessment, collection, remittance, or distribution of tax revenues, areas that are clearly within the exclusive jurisdiction of IDOR. If anything, finding circuit court jurisdiction over unjust enrichment claims similar to those at issue here allows an adversely affected municipality an equitable remedy to recoup monies that were wrongfully diverted through a deliberate scheme to missource retail sales and possibly serve as a deterrent going forward.

¶ 34    Finally, computing plaintiffs' damages does not implicate any special expertise of IDOR that is unavailable to the circuit court. To prove damages under plaintiffs' unjust enrichment claims, plaintiffs will need to establish which sales were improperly reported as occurring within the defendant municipalities. From there, calculating damages is a matter of applying a mathematical calculation to all the proven missourced sales that should have been reported as subject to the use tax. Under the statutory scheme for use tax distributions, Chicago is entitled to 0.25% of the retail price of each retail sale subject to the use tax (since under the State Finance Act, Chicago is entitled to 20% of the use tax revenue deposited to the State and Local Sales Tax Reform Fund, which is an amount equal to 1.25% of the retail sale (1.25% x 20% = 0.25%)). For Skokie, plaintiffs would need to prove what Skokie's proportionate share of the use tax revenue was based on its proportionate share of the state's population after allocation of use tax revenue to the other named entities in section 6z-17 of the State Finance Act (30 ILCS 105/6z-17 (West 2016)). These are mere arithmetic calculations derived from competent foundational testimony. Furthermore, even assuming that every other entity entitled to use tax revenue came forward and recovered its proportionate share of diverted use tax from defendants, after disgorgement, the municipal defendants would simply be in the same position had the missourced sales been properly reported as subject to the use tax.

¶ 35    Having determined that the circuit court has subject-matter jurisdiction over the equitable claims at issue, we turn to plaintiffs' arguments that the circuit court erred by dismissing the unjust enrichment claims from the third amended complaint and abused its discretion by denying plaintiffs leave to file a fourth amended complaint alleging unjust enrichment claims against the municipal defendants, the broker defendants, and the retailers. We review a circuit court's dismissal under either section 2-615 or 2-619 of the Code *de novo*. *Edelman, Combs & Latturner*, 338 Ill. App. 3d at 164. We review a circuit court's denial of leave to file an amended pleading for an abuse of discretion. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273-74 (1992).

¶ 36    To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989). "A plaintiff alleging an unjust enrichment [claim] may be seeking to recover a benefit that he gave directly to the defendant or one that was transferred to the defendant by a third party." *State*

*Farm General Insurance Co. v. Stewart*, 288 Ill. App. 3d 678, 691 (1997). Where a plaintiff alleges that a benefit was transferred to the defendant by a third party, a claim for unjust enrichment is recognized in the following situations: (1) where the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) where the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) where the plaintiff for some other reason had a better claim to the benefit than the defendant. *National Union Fire Insurance Co. of Pittsburgh, PA v. DiMucci*, 2015 IL App (1st) 122725, ¶ 67 (citing *HPI Health Care Services*, 131 Ill. 2d at 161-62). Furthermore, an unjust enrichment claim "does not require fault or illegality on the part of [the] defendant[ ]; the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment." (Internal quotation marks omitted.) *DiMucci*, 2015 IL App (1st) 122725, ¶ 67.

¶ 37     We find that the circuit court erred by dismissing plaintiffs' third amended complaint because it stated a cause of action for unjust enrichment against the municipal defendants and the broker defendants. Furthermore, the circuit court abused its discretion by denying plaintiffs' motion for leave to file a fourth amended complaint because the revised proposed fourth amended complaint stated a claim for unjust enrichment against the retailers. In both the third and revised proposed fourth amended complaints, plaintiffs alleged that the municipal defendants received and retained benefits in the form of sales tax revenue that would have been received by Chicago and Skokie as use tax revenue but for the alleged rebate scheme in which the retailers wrongfully reported the situs of retail sales as having taken place within the defendant municipalities. Plaintiffs alleged that the broker defendants received and retained a portion of that sales tax revenue in the form of rebates paid to the brokers by the municipal defendants. Plaintiffs further alleged that the municipal defendants and the broker defendants only received the use tax revenue because of the diversion and rebate scheme, which plaintiffs contend violates the fundamental principles of justice, equity, and good conscience. The third amended complaint stated unjust enrichment claims against the municipal defendants and broker defendants.

¶ 38     Counts I and II of the revised proposed fourth amended complaint, which allege all of the same essential facts as the third amended complaint, assert unjust enrichment claims against the retailers, as well as the municipal defendants and the broker defendants. Plaintiffs allege that the retailers misreported sales as having taken place in the defendant municipalities and, like the broker defendants, the retailers retained a portion of the sales tax revenue in the form of a rebate that rightfully should have been plaintiffs' share of the use tax. Because counts I and II of the revised proposed fourth amended complaint assert valid unjust enrichment claims against the retailers, the municipal defendants, and the broker defendants, the circuit court abused its discretion in denying plaintiffs leave to file counts I and II of the revised proposed fourth amended complaint.

¶ 39     The municipal defendants raise no argument on appeal regarding the sufficiency of plaintiffs' unjust enrichment claims contained in the third or revised proposed fourth amended complaint. We find that plaintiffs' third amended complaint and revised proposed fourth amended complaint sufficiently stated an unjust enrichment claim against the municipal defendants.

¶ 40     The broker defendants, however, contend that the revised proposed fourth amended complaint is conclusory because it "lump[s] together twenty-nine entities Plaintiffs propose

adding as 'internet-retailer' defendants[,] making only general allegations that they engaged in a "use tax-sales tax swap' or 'procurement company' sourcing." That argument is irrelevant because it says nothing about the sufficiency of plaintiffs' claims against the brokers, and the brokers lack standing to assert any argument on behalf of the retailers.

¶ 41     The broker defendants further contend that the circuit court did not abuse its discretion in denying plaintiffs leave to file the revised proposed fourth amended complaint because there was no connection between plaintiffs and broker defendants. We disagree. Plaintiffs can maintain an unjust enrichment claim against the broker defendants because plaintiffs allege that the brokers received rebates from the municipal defendants through the wrongful conduct (see, *e.g.*, *DiMucci*, 2015 IL App (1st) 122725, ¶ 67), namely a scheme in which the brokers received a portion of the sales tax through the rebate agreement paid by the municipal defendants in connection with the agreement to deliberately missource retail sales. Plaintiffs allege that the brokers participated in this scheme to divert use tax revenue to the municipal defendants as sales tax revenue and received a rebate as part of the scheme. Plaintiffs allege that the brokers set up sham offices in the defendant municipalities and performed sham services for the internet retailers to provide a basis for the internet retailers to report to IDOR that out-of-state retail sales took place within the defendant municipalities. The plaintiffs alleged that the rebate payments to the broker defendants and the retailers came from the use tax revenue that was diverted to the municipal defendants in the form of sales tax by virtue of the scheme. We find that the plaintiffs have sufficiently alleged wrongful conduct sufficient to maintain an unjust enrichment claim against the broker defendants. The same reasoning applies to the retailers since the retailers allegedly agreed to report their out-of-state retail sales as having taken place within the defendant municipalities in exchange for a portion of the sales tax revenue diverted to the municipal defendants under the diversion scheme.

¶ 42     Finally, the broker defendants argue that all of plaintiffs' constructive trust claims fail because a constructive trust requires (1) the existence of identifiable property to serve as the *res* upon which a trust can be asserted and (2) possession of that *res* by the person who is to be charged as constructive trustee. See *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 502 (1986). However, a constructive trust is an appropriate remedy for an unjust enrichment claim. See *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 299 (2000) ("When a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it, a constructive trust can be imposed to avoid unjust enrichment."). Plaintiffs' third amended complaint and revised proposed fourth amended complaint stated valid claims for unjust enrichment, and thus a constructive trust is an appropriate remedy.

¶ 43                                CONCLUSION

¶ 44     For the foregoing reasons, we find that IDOR does not have exclusive jurisdiction over the unjust enrichment claims set forth in plaintiffs' third amended complaint and revised proposed fourth amended complaint. Furthermore, we find that plaintiffs' third amended complaint and revised proposed fourth amended complaint stated claims of unjust enrichment against the municipal defendants, the broker defendants, and the proposed internet retailer defendants. Accordingly, the judgment of the circuit court dismissing plaintiffs' third amended complaint with prejudice and denying leave to file a fourth amended complaint is reversed. This matter is

remanded for further proceedings consistent with this opinion. On remand, the circuit court is instructed to permit plaintiffs to file the claims set forth in counts I and II of the revised proposed fourth amended complaint.

¶ 45          Reversed and remanded with directions.