2022 IL App (1st) 201162-U

SIXTH DIVISION
January 7, 2022

No. 1-20-1162

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| NANCY BRENNAN,<br><br>    Petitioner,<br><br>v.<br><br>THE BOARD OF EDUCATION OF THE CITY OF CHICAGO and JANICE K. JACKSON, Chief Executive Officer,<br><br>    Respondents. | On a Petition for Administrative Review From the Board of Education of the City of Chicago<br><br>No. 20-0923-RS4 |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The Board's final administrative decision dismissing petitioner is affirmed.

¶ 2     Petitioner, Nancy Brennan, appeals from the final administrative decision of the Board of Education of the City of Chicago (Board) dismissing petitioner as a tenured teacher from Chicago Public Schools. On appeal, petitioner argues (1) the Board lost jurisdiction to remove her as a tenured teacher where the hearing officer failed to issue her findings of fact, conclusions of law, and recommendation within 30 days of the administrative hearing; (2) the Board violated her due

process rights by failing to call as a witness the original evaluator who gave her an unsatisfactory performance rating; (3) she was denied a fair hearing where the Board failed to produce certain documents in discovery; and (4) the Board's final administrative decision is against the manifest weight of the evidence. We affirm the Board's final administrative decision.

¶ 3                                    I. BACKGROUND

¶ 4     On August 9, 2019, Janice K. Jackson, as chief executive officer of the Board, approved dismissal charges against petitioner, a tenured teacher assigned to The Ogden International School of Chicago (Ogden). Petitioner, a special education teacher, received an unsatisfactory rating for the 2017-18 school year, and was placed on a remediation plan for the 2018-19 school year. A qualified consulting educator assisted petitioner in improving her performance and completing remediation. The evaluator, the school's principal, and petitioner developed a 90-school-day remediation plan. At the end of the remediation, an evaluator conducted a final evaluation and determined petitioner failed to attain a "proficient" or better level of performance. Petitioner was therefore subject to dismissal. The Board informed petitioner that charges had been approved pursuant to section 34-85 of the Illinois School Code (105 ILCS 5/34-85 (West 2018)), and the matter was set for a hearing.

¶ 5     A hearing officer was appointed, and an agreed scheduling order was entered, which provided that the parties submit final disclosures no later than January 10, 2020, and that petitioner would submit an updated answer and defenses no later than January 24, 2020. Petitioner's answer denied the charges and raised eight generic affirmative defenses. Prior to the hearing, the Board disclosed four potential witnesses: Amanda Smith, a REACH project manager; Maria Orvalle, a consulting educator; Rebecca Bancroft, the former principal at Ogden; and petitioner. The Board also identified numerous exhibits it might introduce at the hearing. Petitioner did not disclose any

witnesses or documents prior January 10, 2020, and did not file an updated answer prior to January 24, 2020.

¶ 6 The hearing commenced on February 6, 2020. The parties stipulated to admission into evidence the Board's exhibits 1 through 28. The hearing officer then heard witness testimony.

¶ 7 A. Amanda Smith

¶ 8 Amanda Smith gave the following testimony. She was the senior manager of educator effectiveness in the talent department for CPS, which was responsible for teacher evaluations and remediation. Tenured educators who receive unsatisfactory ratings are placed in remediation to improve. CPS uses the REACH evaluation process. REACH evaluators are trained and certified and use a rubric to score teachers on four "domains," which have various "components." REACH ratings are based on observations of a teacher's classroom work along with evidence submitted by the teacher and pre- and post-observation conferences. The evaluator scores each component, which is then weighted into a composite score corresponding with a "REACH Rating." The four REACH Ratings are "excellent," "proficient," "developing," and "unsatisfactory."

¶ 9 In the 2017-18 school year, petitioner was observed three times by REACH evaluators and received an unsatisfactory rating. Based on that rating, petitioner was required to participate in a remediation plan for the 2018-19 school year. Petitioner appealed her unsatisfactory rating to an appeals committee comprising four Illinois State Board of Education certified former educators. The appeals committee had access to all the information used to develop the REACH Rating and could accept evidence from the teacher appealing and conduct interviews. The appeals committee denied petitioner's appeal, finding her unsatisfactory rating was supported by evidence.

¶ 10 During remediation, a consulting educator is selected to assist the teacher undergoing remediation. Consulting educators are other tenured teachers who have received a rating of

"excellent" and who serve as mentors or coaches to the teacher in remediation. Maria Ovalle, who was certified to teach special education, was selected as petitioner's consulting educator. Once a consulting educator is selected, by the school's principal or evaluator, the consulting educator, and the teacher in remediation develop a remediation plan. Michael Beyer, the principal of Ogden at the time petitioner's remediation plan was developed, participated in developing the plan, but he was replaced as principal by Rebecca Bancroft during the remediation plan. The remediation plan is "a starting point" that provides teachers with "suggestions to get their remediation plan started." Petitioner's remediation plan did not change when Beyer left, and Bancroft conducted petitioner's midpoint and final evaluations. Ovalle, as consulting educator, kept two logs, Log A and Log B. Log A comprised Ovalle's notes from classroom observations. Log B comprised coaching notes given to petitioner that were developed from the notes in Log A. Principal Bancroft conducted a formal observation after the 45th day of petitioner's remediation, which was for informative purposes only and did not count toward petitioner's final rating. After the midpoint observation, a meeting was held with petitioner and Ovalle where they discussed the evidence collected during the observation. Prior to the final formal observation, which takes place after the final day of remediation, a pre-observation conference took place. Petitioner did not provide any notes or data for the pre-observation conference, despite an opportunity to do so. After the final observation, Bancroft submitted her final ratings and petitioner was given an unsatisfactory rating. In Smith's opinion, the remediation process was "procedurally sound."

¶ 11    On cross-examination, Smith testified that the teacher in remediation only sees the consulting educator's Log B. With respect to petitioner's appeal of her 2017-18 unsatisfactory rating, the appeals committee voted 4-0 to deny the appeal, but she did not recall the names of the

members of the appeals committee. On redirect, Smith testified Log B contained Ovalle's suggestions to help petitioner improve her performance throughout the remediation process.

¶ 12                                    B. Rebecca Bancroft

¶ 13    Bancroft gave the following testimony. She had been employed by CPS since 2006. She was the assistant principal of Back of the Yards College Prep High School from 2015 until she was appointed the acting principal at Ogden for the 2018-19 school year, after which she returned to Back of the Yards as the assistant principal. Before she was an assistant principal, she was a special education teacher. As Ogden's principal, she oversaw instructional leadership, which included teacher evaluations, and she was a certified and trained REACH evaluator. She had conducted hundreds of REACH observations, but petitioner's was the first remediation she had overseen. She was familiar with the CPS teaching framework, as well as a special education addendum, and used the teaching framework and special education addendum while evaluating petitioner's performance. The teaching framework and special education addendum are available to teachers.

¶ 14    Within a month of starting at Ogden, Bancroft was informed that petitioner was on a remediation plan. Ovalle was selected as the consulting teacher before Bancroft started at Ogden. Petitioner never expressed any concerns about the remediation plan or complained that it was unfair. She reviewed petitioner's remediation plan before conducting any evaluations. Based on the remediation plan, petitioner needed improvement in every area of the teaching framework. She agreed with remediation suggestions made by Beyer. She never heard any complaints from petitioner that Ovalle was not helping her. At the pre-observation conference prior to the midpoint evaluation, Bancroft discussed with petitioner what she would be observing, what the students would be learning, and what petitioner's role was. Petitioner also filled out written answers to

several pre-conference questions. Bancroft believed petitioner's answers were not aligned with what Bancroft observed in the classroom. Bancroft did not believe the pre-observation conference was productive because petitioner was not able to discuss the lesson that would be observed, what her instructional decisions were or the rationales behind those decisions, or how the students were supported. Bancroft gave detailed testimony with respect to her rating for each component of each domain in the teaching framework. Bancroft rated petitioner "unsatisfactory" in most components, with some ratings of "basic." Bancroft testified to what recommendations she made regarding each area. During a post-observation conference between just Bancroft and petitioner, Bancroft encouraged petitioner to establish relationships with her students, better utilize the co-teacher, and ensure the students had resources and support. Petitioner requested to attend professional development programs within the district, and Bancroft approved one session. Bancroft, Ovalle, and petitioner attended a midpoint meeting where some of petitioner's concerns were addressed.

¶ 15    Bancroft conducted a pre-observation conference before petitioner's final evaluation. Petitioner did not complete an optional pre-observation questionnaire or send a classroom unit or lesson or task for review before of the conference. The pre-observation conference was not productive because petitioner was unprepared. Bancroft conducted the final classroom evaluation. Bancroft's ratings of petitioner's performance were virtually identical to the midpoint evaluation ratings. After the final evaluation, petitioner did not upload any notes ahead of the post-observation conference and the conference was unproductive. Petitioner became upset, accusing Bancroft of being unfair. Bancroft ended the meeting when petitioner became disgruntled. Petitioner's final rating was "unsatisfactory," and, in Bancroft's opinion, petitioner did not successfully complete the remediation with a rating of "proficient" or better.

¶ 16                                   C. Maria Ovalle

¶ 17    Ovalle gave the following testimony. She taught in Chicago public schools for 24 years as a special education teacher and had worked for the Board of Education for two years as a special education coach and one year as special education administrator. She had REACH ratings of "excellent" for the preceding three years and was at teacher Currie High School at the time of the hearing. She was familiar with the teaching framework and the special education addendum. She reviewed Brennan's remediation recommendations and she participated in creating the remediation plan. She recommended that petitioner continue to attend professional development and work with peers in developing depth of knowledge. Beyer had recommended petitioner observe other teachers, which Ovalle felt would be helpful. Ovalle and petitioner agreed about the final remediation plan. Her role as a consulting educator was to provide suggestions for support, to work with a teacher to engage in different teaching activities and to improve the learning of students, and to work on areas in need of improvement.

¶ 18    During petitioner's remediation, Ovalle gave advice to improve petitioner's teaching and that advice covered various domains of the REACH evaluation process. She identified both Log A and Log B and explained that Log A contained her observation notes and notes of discussions she had with petitioner. Log A was only available to her and the CPS department covering the remediation. Log B contained compliments to the teacher as well as concerns and recommendations but does not contain the specific observations made in Log A. Log A accurately reflected her observations and Log B accurately reflected the suggestions and recommendations she made based on the observations she noted in Log A. Ovalle gave detailed testimony regarding the observations she made that were reflected in Log A and the regular discussions she had with petitioner about those observations, her specific recommendations based on what she observed,

7

and the resources she suggested. In Ovalle's opinion, petitioner did not improve during remediation.

¶ 19    On cross-examination, Ovalle testified that petitioner did do some things well and made some improvements in some areas. Petitioner seemed happier after Beyer left the school. Petitioner was cooperative. On redirect, she testified that, from her observations, there was a disconnect between petitioner and Beyer, and petitioner seemed "more positive" after he left.

¶ 20                                    D. Lillian Kass

¶ 21    Petitioner called Lillian Kass as a witness, who gave the following testimony. She was a special education teacher at Ogden. She was colleagues with petitioner. She had personal knowledge of the administration planning to get rid of petitioner and had been informed that Beyer was trying to get rid of petitioner. On cross-examination, she testified she had never been part of a remediation plan and was not present during petitioner's final observation on her remediation plan. She did not provide any evaluations for petitioner's remediation plan and was not a certified REACH evaluator.

¶ 22                                    E. Ian McCutcheon

¶ 23    Ian McCutcheon gave the following testimony. He was a parent of a student at Ogden and petitioner had been his son's teacher. His son spoke very positively of petitioner. McCutcheon was very confident in petitioner's handling of his son. On cross-examination, he testified he was not aware of any specific accommodations petitioner made for his son. Petitioner wrote his son a letter of recommendation for an extracurricular summer program, to which his son was accepted. He was not present for any of petitioner's evaluations. He was not a teacher or an educator and was not aware of the REACH program. He believed that petitioner forged a positive relationship with his son that helped him succeed and thrive as a student.

¶ 24                            F. Petitioner's Testimony

¶ 25    Petitioner gave the following testimony. She was employed at a charter school in Chicago as a special education teacher. The initial unsatisfactory rating she received for the 2017-18 school year was unfair. Beyer would harass her and follow her around. He would spring evaluations on her and send her "nasty" e-mails. After Beyer was removed, she had very little interaction with Bancroft. Petitioner attempted to reschedule an initial meeting to discuss the remediation plan because her husband had just gotten out of the hospital, but she attended the meeting. She testified to specific disagreements she had with her ratings and offered explanations for a variety of specific actions she took as a teacher and why they were justified. She believed her initial unsatisfactory rating was based on issues she had with Beyer. Beyer had assigned her a student for "compensatory services"—which are services to a "diverse learner"—because the student's mother was "head of the booster club." Beyer also told her that she needed his approval before she could dissent from an individualized education plan (IEP). Regarding the formation of the remediation plan, she testified Beyer had already decided what was going to happen. She did not really have a chance to give input in the remediation plan. While she signed the remediation plan, she verbally objected to it. She believed there was a toxic environment at Ogden under Beyer, and she filed grievances. She also believed Bancroft was biased against her. She had no conversations with Bancroft other than as part of the remediation.

¶ 26    She did "tons" of professional development. She went through Ovalle's suggestions, and they talked on a regular basis, although she disagreed with a lot of the criticisms she received. She also felt there were too many students in her class, and she had complained about that. She complained about issues with student's IEPs, and the problems with the IEPs interfered with the

remediation process. Even if the Board ruled in her favor, she would not return to Ogden because "it is a hostile place to work."

¶ 27    On cross-examination, petitioner acknowledged that she did not have any disagreements with Ovalle. No one stopped her from providing input when developing the remediation plan. She agreed with some of the recommendations that Ovalle made and had no reason to believe that Ovalle wanted her to fail. She had a positive experience observing a different special education teacher.

¶ 28    Following the hearing, the parties submitted written posthearing briefs, the last of which was received on May 20, 2020.

¶ 29    G. The Hearing Officer's Findings and Recommendation and the Board's Decision

¶ 30    On August 28, 2020, the hearing officer filed her findings of fact and recommendation. After a detailed recitation of the testimony and evidence, the hearing officer made the following findings. The Board proved by a ponderance of the evidence that petitioner received an "unsatisfactory" teacher performance and failed to attain a rating of "proficient" or better following remediation. CPS followed all the procedural requirements for dismissing a tenured teacher. Petitioner's disagreements with Bancroft's ratings were insufficient to overcome Bancroft's documentation of conversations, assessments, and actual observations. The hearing officer found "[t]he essential weakness with [petitioner's] defense is that while petitioner asserts generally that she engaged in particular tasks and practices to satisfy various components of the Framework domains, her testimony does not refute Bancroft's specific testimony that [petitioner] failed to satisfy the components in the classes that Bancroft observed." While petitioner asserted Beyer's initial low rating was retaliatory, there "is no evidence to show Dr. Beyer had any role in or influence on [petitioner's] remediation process or Bancroft's ratings of [petitioner] after [Beyer]

10

was removed from Ogden *** or that either Ovalle or Bancroft was influenced by any retaliatory motive." The record supported petitioner's unsatisfactory rating following remediation. The hearing officer recommended petitioner be dismissed.

¶ 31 On September 23, 2020, the Board adopted a resolution dismissing petitioner. The Board reviewed the hearing transcripts, exhibits, posthearing briefs, and the hearing officer's report, and the parties were given an opportunity to submit exceptions. The Board accepted the hearing officer's factual findings and recommendation that petitioner be dismissed.

¶ 32 Petitioner filed a timely petition for review in this court pursuant to section 34-85(a)(8) of the School Code (105 ILCS 5/34-85(a)(8) (West 2020)) and Illinois Supreme Court Rule 335 (eff. July 1, 2017)

¶ 33 II. ANALYSIS

¶ 34 Petitioner raises four issues on appeal. She contends the Board lost jurisdiction to dismiss her because the hearing officer did not issue her findings of fact and recommendation within 30 days of the closing of the administrative record. She contends the Board violated her due process rights by failing to call Beyer as a witness and by failing to produce Log A. Finally, she asserts the Board's final decision was against the manifest weight of the evidence. We address these arguments in turn.

¶ 35 A. The Board's Jurisdiction

¶ 36 Petitioner first argues that the Board lost jurisdiction to terminate her employment because the hearing officer failed to issue a report within 30 days of the closing of the administrative record, as required by section 34-85(a)(6) of the School Code (105 ILCS 5/34-85(a)(6) (West 2020). Petitioner's posthearing brief was submitted on May 20, 2020, but the hearing officer did not issue her findings and recommendation until August 28, 2020. Petitioner asserts—without citation to

any authority—that "[t]he 30-day rule is akin to a statute of limitations and must be obeyed the same as all statutes of limitations." In her view, the hearing officer's failure to issue a recommendation within the time prescribed by section 34-85(a)(6) requires dismissal of the charges. We note the record does not contain any evidence that petitioner raised this issue with the Board by way of filing an exception. We reject the argument that the Board lost jurisdiction due the hearing officer's untimely report.

¶ 37    Petitioner's argument implicates issues of statutory construction and the Board's jurisdiction, both of which are questions of law that we review *de novo*. *Roberts v. Alexandria Transportation, Inc.*, 2021 IL 126249, ¶ 28; *J&J Ventures Gaming, LLC v. Wild*, 2016 IL 119870, ¶ 25. The fundamental rule of statutory construction is to ascertain and effectuate the legislature's intent. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 14. We look to the plain language of the statute and give each term its plain and ordinary meaning and construe the language of the statute in light of other relevant statutory provisions. *Haage v. Zavala*, 2021 IL 125918, ¶ 44.

¶ 38    Section 34-85(a)(6) of the School Code provides in part

> "The hearing officer shall within 30 calendar days from the conclusion of the
> hearing report to the general superintendent findings of fact and a recommendation
> as to whether or not the teacher or principal shall be dismissed and shall give a copy
> of the report to both the teacher or principal and the general superintendent."

¶ 39    Petitioner contends the legislature's use of the phrase "shall within 30 days *** report *** findings of fact and a recommendation" should be given a mandatory reading, and that the hearing officer's failure to comply with the legislature's mandate should result in a finding that the Board loses jurisdiction to discipline a teacher. Petitioner, however, fails to advance any argument addressing the relevant principles our supreme court has identified when

12

examining legislative procedural commands. Our supreme court has repeatedly observed a distinction between mandatory and directory legislative commands. The legislature's use of the word "shall" suggests a government official has an "obligatory duty" that it is required to perform, rather than possessing discretion to choose whether to perform or not. See *People v. Delvillar*, 235 Ill. 2d 507, 514 (2009) (explaining distinction between mandatory and permissive statutory provisions). A second question, however, asks whether a statutory command is mandatory or directory. The court recently reiterated

> " 'the law presumes that statutory language issuing a procedural command to a government official is directory rather than mandatory, meaning that the failure to comply with a particular procedural step will not have the effect of invalidating the governmental action to which the procedural requirement relates. That presumption can be overcome under either of two conditions: (1) when there is negative language prohibiting further action in the case of noncompliance or (2) when the right the provision is designed to protect would generally be injured under a directory reading.' " *Lakewood Nursing & Rehabilitation Center, LLC v. Department of Public Health*, 2019 IL 124019, ¶ 29 (quoting *In re James W.*, 2014 IL 114483, ¶ 35 (citing *In re M.I.*, 2013 IL 113776, ¶¶ 16-17)).

¶ 40    Here, section 34-85(a)(6), in part, instructs the hearing officer to issue findings of fact and a recommendation within 30 days from the conclusion of the administrative hearing. The statute is silent as to what, if any, consequences must result if the hearing officer does not comply with the 30-day requirement. "[T]he absence of language specifying a particular consequence for noncompliance with the provision results in a directory interpretation" of the statutory command. *Lakewood Nursing & Rehabilitation Center*, 2019 IL 124019, ¶ 33 (citing *In re M.I.*, 2013 IL

113776, ¶ 16). We therefore presume that the 30-day requirement in section 34-85(a)(6) is directory rather than mandatory.

¶ 41    Petitioner offers no argument to rebut that presumption. She does not direct our attention to any language prohibiting further action in the case of a hearing officer's noncompliance and offers no argument as to what right section 34-85(a)(6) is designed to protect, or how that right would generally be injured under a directory reading of the statutory language. Instead, she contends we should view section 34-85(a)(6) in light of section 34-85(a)(7), which provides, in part,

> "The board, within 45 days of receipt of the hearing officer's findings of fact and recommendation, shall make a decision as to whether the teacher or principal shall be dismissed from its employ. *The failure of the board to strictly adhere to the timeliness contained herein shall not render it without jurisdiction to dismiss the teacher or principal*." (Emphasis added.) 105 ILCS 5/34-85(a)(7) (West 2020).

¶ 42    In petitioner's view, because the legislature expressly provided that the Board does not lose jurisdiction for failing to take prompt action on the hearing officer's report, but the legislature made no such express provision regarding the hearing officer's failure to take prompt action, then the legislature intended for the Board to lose jurisdiction when the hearing officer fails to issue findings and a recommendation within 30 days. We disagree. The legislature's omission of any consequence for the hearing officer's failure to comply with the 30-day requirement suggests a directory reading of the statute. If the legislature intended the Board to lose jurisdiction in teacher discipline cases where the hearing officer fails to issue findings and recommendations within 30 days from the conclusion of the hearing, it would have said so. The fact the Board does not lose jurisdiction where it fails to decide within 45 of receiving the hearing officer's report suggests the

14

Board possesses jurisdiction to consider the hearing officer's report even if the hearing officer did not submit the report within 30 days. Furthermore, section 51.75(c) of the Administrative Code provides

> "If the hearing officer is appointed from the master list developed by the State Board and he or she fails, without good cause, to render findings of fact and recommendation within the required timeframe, then his or her name shall be struck from the master list of hearing officers for a period of at least 24 months. Other action may be taken as provided in Section 51.70(c) of this Part." 23 Ill. Adm. Code 51.75(c) (2012).

¶ 43     Section 51.70(c) provides that if the hearing officer fails to issue a decision within 30 days, "the parties may mutually agree to select a hearing officer pursuant to the alternative selection procedures provided under Section 24-12(d)(4) of the School Code to rehear the charges or review the record and render a decision." *Id.* § 51.70(c). Furthermore, the hearing officer's name will be stricken from the master list for at least 24 months, the hearing officer's fee may be reduced, and a second violation by the hearing officer will result is a permanent ban from the master list. *Id.* Section 24-12(d)(4) of the School Code provides the parties may agree to select a new hearing officer from outside the master list of approved hearing officers. From this, it is clear that any consequence that attaches from the hearing officer's failure to comply with section 34-85(a)(6) falls on the hearing officer and does not inure to the benefit of the teacher, and the parties may select a new hearing officer to rehear the case on the merits. The existence of these procedures show the Board retains jurisdiction to consider the underlying disciplinary charges even if the hearing officer does not comply with section 34-85(a)(6) of the School Code.

¶ 44    For the reasons we have set forth above, we reject petitioner's argument that the Board lost jurisdiction where the hearing officer failed to issue her report within 30 days of the closing of the administrative record.

¶ 45                                B. Due Process

¶ 46    Petitioner argues the Board violated her due process rights by failing to call Ogden's former principal, Michael Beyer, as a witness at the hearing. She contends Beyer was the one who gave her the unsatisfactory rating that led to her remediation and Beyer participated in formulating her remediation plan. Petitioner argues the Board "was on notice that [petitioner] was claiming that [petitioner's] original unsatisfactory rating from Beyer based [*sic*] on personal animus and NOT an honest assessment of [petitioner's] teaching abilities," yet the Board did not call Beyer "to rebut those charges." She relies on *Kimble v. Illinois State Bd. of Education*, 2014 IL App (1st) 123436 to argue the Board violated her due process right to "confront and cross-examine material adverse witnesses." In essence, petitioner is arguing that, because petitioner received her initial unsatisfactory rating from Beyer, the Board should have called him at the hearing to rebut petitioner's claims that his evaluation was tainted by a personal or retaliatory animus.

¶ 47    Tenured teachers have "a property interest in continued employment that is protected by the principles of due process." *Kimble*, 2014 IL App (1st) 123436, ¶ 77 (citing *Board of Education of Community Consolidated School District No. 54 v. Spangler*, 328 Ill. App. 3d 747, 755-56 (2002)). A fair administrative hearing includes " 'the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence.' " *Id.* ¶ 78 (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 135 Ill. 2d 76, 95 (1992)). Where the Board's procedures violated due process, we should reverse the Board's decision. *Id.* Whether a party's due process rights were violated is a question of law reviewed *de novo*. *Id.* ¶ 76.

¶ 48    We find petitioner forfeited her due process claim by failing to raise it before the Board. "Ordinarily, any issue that is not raised before the administrative agency *** will be forfeited by the party failing to raise the issue." *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No. 210*, 231 Ill. 2d 184, 205 (2008) The Board correctly notes that petitioner never raised any issue before the Board regarding Beyer's absence from the hearing. At no point before, during, or after the hearing did petitioner assert Beyer should have been called as a witness. The Board's initial and updated prehearing disclosures put petitioner on notice that it did not intend to call Beyer as a witness. Petitioner never disclosed that she intended to call Beyer as a witness and never requested the Board to subpoena his testimony. Petitioner did not object at the hearing that Beyer should have testified, she raised no argument in her posthearing brief that Beyer's testimony was necessary, and nothing in the record establishes that she filed an exception with the Board asserting that Beyer's testimony was necessary. Furthermore, the record reflects that the first mention of any alleged bias or retaliation by Beyer came immediately prior the commencement of the hearing. At the very beginning of the hearing, petitioner's counsel advised the hearing officer that he had filed a motion to supplement the record—which does not appear in the record—with materials intended to support petitioner's claim that her performance rating was the result of retaliation. Despite having ample time to formulate defenses and identify witnesses, the record before us demonstrates that petitioner took virtually no steps toward making Beyer's alleged bias an issue until the very start of the hearing, well after the time for witness and document disclosures ended. She then took no steps to assert that Beyer's absence from the hearing violated her due process rights. Petitioner forfeited her due process claim by failing to raise it before the Board.

¶ 49    Forfeiture aside, petitioner fails to establish that Beyer's testimony was necessary for the Board to prove its case. Petitioner stipulated to the admission of numerous exhibits at the hearing, including documentation of petitioner's initial unsatisfactory rating and the remediation plan. It was undisputed that petitioner received an unsatisfactory rating for the 2017-18 school year, which was upheld by an appeals committee. In our view, petitioner failed to establish that Beyer was a necessary witness, or that his testimony was necessary to prove the case against petitioner. The hearing officer heard testimony from Smith, Bancroft, and Ovalle that petitioner received an unsatisfactory rating for the 2017-18 school year, was placed in remediation, and failed to attain a proficient or better rating by the end of the remediation period. At most, petitioner argues that Beyer should have been called to respond to petitioner's own allegations that Beyer was biased against her. But if petitioner wanted to elicit testimony from Beyer that he was biased against her and that his unsatisfactory rating was based on that bias, petitioner should have called him as a witness. To the extent that petitioner sought to raise a defense that her initial unsatisfactory rating was invalid, despite evidence in the record establishing its validity, she needed to present evidence establishing that to be true. Petitioner had ample time prior to the hearing to identify Beyer as a witness and request the Board subpoena his testimony. But she did not. In short, Beyer's testimony was not necessary to prove the charges against petitioner, and the Board was not obligated to call him as a witness.

¶ 50    Petitioner relies on *Kimble*, but that reliance is misplaced. There, Sharon Kimble, a tenured teacher, faced dismissal charges for allegedly pushing and choking a J.W., a 10-year-old student. *Kimble*, 2014 IL App (1st) 123436, ¶ 1. The Board did not call J.W. as a witness at the hearing, and the Board ultimately dismissed Kimble. On appeal, Kimble argued the hearing violated her due process rights because numerous hearsay statements attributed to J.W. were admitted at the

18

hearing and she had no opportunity to cross-examine J.W. *Id.* ¶ 79. We observed that "none of the witnesses present at the hearing observed the entirety of either the 'push' or the 'choke.' " *Id.* ¶ 82. Without J.W.'s testimony, there was insufficient evidence to support dismissal. *Id.* We emphasized that Kimble had been terminated "based almost entirely on the hearsay statements of one student, who was not present at the hearing." *Id.* ¶ 84. In reversing the Board's decision, we concluded Kimble's due process rights were violated because she was not afforded an opportunity to cross-examine J.W. *Id.* ¶ 88.

¶ 51 The situation before us bears little resemblance to *Kimble*. Here, it was undisputed that petitioner received an unsatisfactory rating for the 2017-18 school year, and that rating was upheld by an appeals committee. Those facts were established in the documents admitted into evidence by stipulation of the parties, and therefore the Board did not rely on any hearsay evidence from Beyer in reaching its conclusion. The Board did not need to hear Beyer's testimony to establish the initial unsatisfactory rating, and thus the Board did not deprive petitioner of her right to cross-examine Beyer. *Kimble* simply does not support petitioner's position.

¶ 52 We find petitioner forfeited her due process claim by failing to raise it before the Board, and forfeiture aside, she failed to establish a due process violation premised on Beyer not testifying at the hearing.

¶ 53 We also reject petitioner's second due process argument that the Board violated her due process rights by failing to produce in discovery the notes Ovalle took during remediation contained in Log A. Petitioner asserts "While we do not know what was in Ms. Ovalle's anecdotal notes, it is entirely possible that they contained exculpatory material." The Board responds that it produced Log A in discovery, and that petitioner's counsel stipulated to its the admission at the hearing. Furthermore, at the hearing, Ovalle testified about the contents of Log A, and petitioner's

own testimony referred to various pages of Log A. In her reply brief, petitioner does not acknowledge the Board's argument, and her argument on this issue in her reply brief comprises one sentence: "No reply argument will be made here." It is thus uncontested that the Board produced Log A and the contents of Log A were known to petitioner prior to the hearing. We fail to see how petitioner can maintain a due process claim premised on the Board's failure to produce evidence when that evidence was in fact produced and repeatedly discussed during the hearing. Petitioner's argument that she was deprived of a fair hearing based on the Board's failure to produce certain documents that were in fact produced and discussed at the hearing lacks merit.

¶ 54                                 C. The Board's Decision

¶ 55    Finally, petitioner argues the Board's final administrative decision was against the manifest weight of the evidence. She asserts her termination was tainted because her unsatisfactory rating was the result of Beyer's retaliation, and that Bancroft was biased against her when formulating her final rating following remediation. Petitioner does not engage with any of the Board's actual findings, and her argument amounts to little more than a claim that there was some evidence that was favorable to her. We find petitioner has failed to identify any basis for reversing the Board's decision.

¶ 56    On administrative review, our standard of review depends on the question presented. An administrative agency's factual findings are considered *prima facie* true, and we only reverse those factual findings if they are against the manifest weight of the evidence. *Board of Education of City of Chicago v. Moore*, 2021 IL 125785, ¶ 17. Questions of law are reviewed *de novo*. *Id.* Mixed questions of law and fact and reviewed under the clearly erroneous standard. *Id.*

¶ 57    Here, petitioner does not contest the Board's finding that she failed to attain a rating of proficient or better following remediation, and she acknowledges she was subject to dismissal. 105

ILCS 5/24A-5(m) (West 2018); *Davis v. Board of Education of City of Chicago*, 276 Ill. App. 3d 693, 697 (1995) ("Failure to complete a remediation plan under article 24A with a satisfactory or better rating constitutes cause for dismissal.") (citing *Powell v. Board of Education of City of Peoria*, 189 Ill. App. 3d 802, 137 (1989)). Her argument is essentially there were other facts in the record—her own testimony that Beyer and Bancroft were biased and Kass's testimony that she was aware of a conspiracy to remove petitioner—that the Board should have given more weight. However, on administrative review, we do not reweigh the evidence or substitute our judgment for that of the Board. *Board of Education of City of Chicago v. Illinois Educational Labor Relations Board*, 2015 IL 118043, ¶ 15. Here, the Board heard detailed witness testimony and received unrebutted documentary evidence showing petitioner received an unsatisfactory rating for the 2017-18 school year, she was placed in remediation, and she failed to achieve a rating of proficient or better following a procedurally sound remediation program. Any questions about whether Beyer or Bancroft were biased or whether such bias affected petitioner's performance ratings were questions of fact that the Board was tasked with resolving, and which it ultimately found unpersuasive. As the Board noted, Beyer had no influence over Bancroft's evaluation of petitioner's performance, and petitioner's claim that Bancroft was biased was premised solely on the fact that Bancroft and petitioner had little interaction other than during remediation. Petitioner has failed to demonstrate that the Board's finding on any issue of fact was against the manifest weight of the evidence, or that the Board's final decision was clearly erroneous.

¶ 58                                  III. CONCLUSION

¶ 59    For the foregoing reasons, the Board's final administrative decision dismissing petitioner is affirmed.

¶ 60    Board decision affirmed.